UNITED STATES of America, Appellant,

v.

Albert E. MILLS.

UNITED STATES of America, Appellant,

v.

Kenneth B. WONSON.

Nos. 90–3007, 90–3008.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Nov. 20, 1991.

Decided May 29, 1992.

Robert H. Tiller (appointed by the Court), with whom Alan P. Bayles, Washington, D.C., (appointed by the Court) was on the brief, for defendants. Richard G. Taranto, Washington, D.C., also entered an appearance for defendant Kenneth B. Wonson in No. 90–3008.

David A. Reiser, with whom Rosemary Herbert and James W. Klein, Public Defender Service, and Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., for American Civil Liberties Union, were on the joint brief, for amici curiae urging that the judgments of the District Court be affirmed.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Thomas E. Zeno, Patrice I. Kopistansky and James A. Meade, Asst. U.S. Attys., Washington, D.C., were on the brief, for the U.S. Thomas J. Tourish, Jr., Washington, D.C., also entered an appearance for the U.S.

Before: MIKVA, Chief Judge, WALD, EDWARDS, RUTH BADER GINSBURG, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG, SENTELLE, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge SENTELLE, in which Chief Judge MIKVA and Circuit Judges WALD, HARRY T. EDWARDS and RUTH BADER GINSBURG join.

STEPHEN F. WILLIAMS, Circuit Judge:

We held in *United States v. Robertson*, 810 F.2d 254 (D.C.Cir.1987), that an arrest followed by the filing of charges under District of Columbia law does not constitute an "arrest" triggering the Speedy Trial Act's requirement that a federal indictment be filed within 30 days from the defendant's arrest "in connection with" the charge in the indictment. See 18 U.S.C. § 3161(b) (1988). After a panel applied *Robertson* to the present case, *United States v. Mills*, 925 F.2d 455, 460 (D.C.Cir. 1991), we granted rehearing *en banc* in order to consider whether *Robertson* should be overruled or modified. We adhere to *Robertson* but somewhat modify our statutory analysis.

\* \* \*

Appellees Albert Mills and Kenneth Wonson were arrested in September 1988 and April 1989, respectively.[1] They were charged with possession with intent to distribute cocaine in violation of the D.C.Code and other related D.C. offenses and were indicted in the D.C. Superior Court. While their cases were pending, the Bush Administration announced a new policy for fighting drugs in the District of Columbia; the policy called for prosecution of more drug cases in federal district court (rather than Superior Court) to take advantage of the tougher federal sentences. Accordingly, the U.S. Attorney's Office reviewed pending Superior Court felony drug cases for possible transfer to federal court. The U.S. Attorney selected appellees' cases for transfer and secured their indictment in

federal court—far more than 30 days after the D.C. arrests (seven months in Mills's case, a year in Wonson's). The district court dismissed the indictments on various grounds, including Speedy Trial Act violations. It treated the defendants' initial arrests in connection with the D.C. charges as "arrest[s]" within the meaning of 18 U.S.C. § 3161(b), and thus found a violation of the 30–day requirement. See *United States v. Roberts*, 726 F.Supp. 1359, 1371–72 (D.D.C.1989).[2]

On appeal by the government, the panel reversed on the basis of our decision in *Robertson*. It of course refused to overturn *Robertson*, and it also rejected appellees' suggestion that *Robertson* be limited to the special situation that prevailed there—a D.C. charge (murder) for which the defendant could not have been indicted in federal court. *Mills*, 925 F.2d at 461. And it rejected appellees' argument that these transfers, unlike the one in *Robertson*, involved wrongful prosecutorial "manipulation", noting that it found "absolutely nothing in the record to support this charge." *Id.* at 460–61.[3]

\* \* \*

The Speedy Trial Act provision at issue here provides:

Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was *arrested or served with a summons in connection with such charges.*

18 U.S.C. § 3161(b) (emphasis added). The Act defines "offense" as "any Federal criminal offense". 18 U.S.C. § 3172.

Thus the trigger mechanism is the arrest or service of summons "in connection with such charges." The sole possible referent

---

1. The panel opinion presented the facts in detail, see *Mills*, 925 F.2d at 457–59; here we review them only briefly.

2. The district court also dismissed a pending federal indictment against Mills's co-defendant, Vernon Holland, whose case had also been transferred from the Superior Court. *United States v. Holland*, 729 F.Supp. 125 (D.D.C.1990). Holland died after the appeals were taken. On

remand, the judgment as to Holland should be vacated as moot.

3. The panel also rejected the defendants' due process arguments, see *Mills*, 925 F.2d at 461–64, and remanded the cases to the district court for it to consider whether the transfer of these cases violated the defendants' Sixth Amendment speedy trial rights, *id.* at 464–65. Our opinion here does not disturb those holdings.

for "such charges" is the "offense" charged in the indictment, which because of the definition must be a federal offense. Under the most natural reading, then, an arrest starts the clock only if it is "in connection with" *federal* charges. If, as was the case here, the arrest was accompanied by a complaint charging violations of the D.C. (not U.S.) Code, it was not "in connection with" federal charges.[4]

The remedial provision of the Speedy Trial Act also suggests that the Act is triggered only by arrests that are accompanied by the filing of a *federal* complaint against the defendant. That provision states:

> If, in the case of any individual against whom *a complaint is filed charging such individual with an offense,* no indictment or information is filed within the time limit required by section 3161(b) …, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped.

18 U.S.C. § 3162(a)(1) (emphasis added). As § 3162(a)(1) does not apply where an arrest has occurred but no charges have been filed, the term "arrest" in § 3161(b) "'must be construed as an arrest where the person is charged with an offense.'" *United States v. Solomon,* 679 F.2d 1246, 1252 (8th Cir.1982) (quoting *United States v. Jones,* 676 F.2d 327, 331 (8th Cir.1982)). There appears to be undisputed support among the circuits for this reading of the interplay between §§ 3161(b) and 3162(a)(1). See, e.g., *United States v. Summers,* 894 F.2d 90, 91 (4th Cir.1990); *United States v. Bloom,* 865 F.2d 485, 489–90 (2d Cir.1989); *United States v. Lee,* 818 F.2d 302, 305 (4th Cir.1987); *United States v. Alfarano,* 706 F.2d 739, 741 (6th Cir. 1983); *United States v. Candelaria,* 704 F.2d 1129, 1131–32 (9th Cir.1983); *United States v. Varella,* 692 F.2d 1352, 1357–58 (11th Cir.1982).[5] Again, of course, "offense" means "any *Federal* criminal offense" under § 3172. Thus, if a District of Columbia arrest were understood to start the clock there would be no remedy without a wrench of the statutory language.

Appellees understandably do not directly attack the proposition that an arrest can trigger § 3161(b) only if accompanied by a formal charge. But they insist that a District of Columbia charge is enough. This of course disregards § 3172's definition of "offense" as a "Federal criminal offense" and the fact that "such charges" in § 3161(b) must refer back to the type of offense—federal—charged in the information or indictment. It is also inconsistent with the undisputed rule that a *state* arrest

---

4. Our reading of the Act is consistent with the construction of § 3161(b) made by the U.S. District Court for the District of Columbia (shortly after the Act's passage) when it promulgated a speedy trial plan in accordance with 18 U.S.C. § 3165. Section 4 of the plan implements § 3161(b) and specifically provides that:

> A charge of violation of the District of Columbia Code is not a federal charge … and the time limits of this rule shall not begin to run with respect to a person charged in the Superior Court of the District of Columbia with a District of Columbia Code offense until such person is charged in this [district] court.

Local Rule 306(4)(c), Speedy Trial Plan of the United States District Court for the District of Columbia. Even though the matter is a pure issue of law, it might be appropriate to accord some deference to the district court's contemporaneous interpretation, as it was submitted both to the Administrative Office of the United States Courts and to Congress, 18 U.S.C. §§ 3165(c) & 3167, and resolves an issue unique to this district. Cf. *United States v. Dixon,* 446 F.Supp. 58, 62 (D.D.C.1978) (noting congressional grant of "substantial discretion" to district courts). We do not, however, rest our decision on such deference.

5. The Federal Rules of Criminal Procedure also support this interpretation of the statute, for they contemplate that arrested individuals be charged in a complaint detailing "the essential facts constituting the offense charged". Fed. R.Crim.P. 3. The complaint must be issued prior to arrest if it serves as the basis for an arrest warrant, Fed.R.Crim.P. 4(a), or at the initial appearance before the magistrate if the arrest is conducted without a warrant, see Fed. R.Crim.P. 5(a) (requiring that "complaint shall be filed forthwith" in such cases). Of course the Fourth Amendment requires the prompt filing of charges if the subject is not released. Cf. *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975) (Fourth Amendment requires prompt judicial determination of probable cause as "prerequisite to extended restraint of liberty following arrest" without warrant); see also *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991) (probable cause determinations within 48 hours of arrest satisfy *Gerstein* ).

does not trigger the Speedy Trial Act's clock, even if the arrest is for conduct that is the basis of a subsequent indictment for a federal offense. See, e.g., *United States v. Charles,* 883 F.2d 355, 356 (5th Cir.1989); *United States v. Janik,* 723 F.2d 537, 542 (7th Cir.1983); *United States v. Carlson,* 697 F.2d 231, 235 (8th Cir.1983); *United States v. Adams,* 694 F.2d 200, 202 (9th Cir.1982); *United States v. Iaquinta,* 674 F.2d 260, 264 (4th Cir.1982); *United States v. Mejias,* 552 F.2d 435, 441 (2d Cir.1977).

Appellees and amici attempt to distinguish the state arrest rule on the ground that it is based upon notions of federalism and "dual sovereignty". The argument has two components: one conceptual (the identity of sovereigns), and the other functional (the identity of prosecutors, namely the United States Attorney for the District of Columbia). *Mejias,* the first case addressing a state arrest ultimately followed by a federal indictment, indeed relied in part on the state's separate sovereignty. 552 F.2d at 441. But the *Mejias* court's reliance on separate sovereignty is questionable; under the Sixth Amendment, courts have often treated state arrests as triggering the Amendment for purposes of a later federal charge for the same conduct. See Dissent at 1204. In fact, the Second Circuit also invoked a practical consideration that applies as much to the District as to states—the likelihood of immediate protective federal indictments, clogging the federal courts in contravention of the Act's purpose. See 552 F.2d at 442. Moreover, as we have seen, at pp. 1188–89 above, the most direct explanation of the state arrest rule is congressional intent, as manifested in the terms of the Act.

█ The dissent takes the sovereignty concept still further, arguing that the statutory term "Federal criminal offense" encompasses any D.C. offense that parallels a federal one. See Dissent at 1195–96. If

Congress had been writing the Speedy Trial Act on a clean slate, such a construction might be plausible. But Congress's allocation of jurisdiction between the D.C. Superior court and the U.S. district court— adopted just four years before the Speedy Trial Act—uses a vocabulary in which "Federal offense" is plainly limited to offenses against federal laws in the narrower sense of ones applicable nationwide. In the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473, Congress gave the U.S. district court for the District of Columbia jurisdiction over "[a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any *Federal offense."* See *id.* § 111 (codified at D.C.Code § 11–502(3)) (emphasis added). In this context it seems virtually inconceivable that Congress could have intended the two classes (D.C. only, "Federal") to overlap, for otherwise many of the D.C. offenses that the section brings within federal jurisdiction would already have been there. The legislative history confirms that reading. See, e.g., H.R.Rep. No. 907, 91st Cong., 2d Sess. 33 (1970); see also *United States v. Shepard,* 515 F.2d 1324, 1329–30 (D.C.Cir.1975) (drawing same distinction).[6] It seems most improbable that Congress adopted a completely different nomenclature when it addressed a kindred problem four years later.

Congress also expressly provided in the 1970 Court Reform Act that for purposes of the general jurisdiction of the federal courts references to "laws of the United States or Acts of Congress" do not encompass "laws applicable exclusively to the District of Columbia", see 28 U.S.C. § 1366,[7] and added language to other jurisdictional statutes to clarify that D.C. would be treated as a state for those purposes: 28 U.S.C. § 2113 (for purposes of Supreme

---

6. The background assumption that "federal offenses" do not encompass purely District of Columbia crimes is also manifest in 18 U.S.C. § 3231, which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States,

of all offenses against the laws of the United States."

7. The Supreme Court has refused to give this provision any negative implication. See *Key v. Doyle,* 434 U.S. 59, 67 n. 12, 98 S.Ct. 280, 284 n. 12, 54 L.Ed.2d 238 (1977).

Court jurisdiction, references to "state courts" include District of Columbia Court of Appeals); 28 U.S.C. § 1451 (for purposes of removal jurisdiction, references to "state court" include Superior Court and to "state" include D.C.); 28 U.S.C. § 1257 ("highest court of a State" includes D.C. Court of Appeals). See 84 Stat. 590–91. Accordingly, in construing the phrase "statute of the United States" in former 28 U.S.C. § 1257(1) (1970), which required the Supreme Court to review decisions holding such statutes invalid, to exclude the D.C.Code, the Court explicitly followed "the analogy of the local D.C. courts to state courts drawn by Congress in the 1970 [Court Reform] Act". *Key v. Doyle,* 434 U.S. 59, 68, 98 S.Ct. 280, 285, 54 L.Ed.2d 238 (1977).[8] And we have interpreted the general federal question statute, 28 U.S.C. § 1331, as if D.C. were a state. See, e.g., *Dimond v. District of Columbia,* 792 F.2d 179, 188 (D.C.Cir.1986) (applying pendent jurisdiction analysis to claims arising under D.C. law).

Finally, as the Dissent recognizes, a natural consequence of its reading of "federal" would be the application of the Speedy Trial Act (directly) to all charges in D.C. Superior Court that parallel a possible federal charge. But Congress specifically considered and rejected the idea of applying the Speedy Trial Act to the Superior Court itself. It did so precisely to avoid undue federal interference with D.C. affairs, and thus to accommodate two related trends: (1) increasing political autonomy for D.C., which was to "have popularly-elected officials who will have a legitimate stake in decisions affecting community conditions, particularly with respect to the control of crime and the apprehension and punishment of criminals"; and (2) the "trend of Federal disengagement from District of Columbia judicial and court administration affairs". H.R.Rep. No. 1508, 93d Cong., 2d Sess. 48, *reprinted in* 1974 U.S.C.C.A.N. at 7401, 7440. It explicitly noted the 1970 Court Reform Act as a prime source of these developments. *Id.*

Indeed, under the logic of the dissent's theory, even *state* charges involving federally criminal conduct would trigger the Act, in contrast to the long and unbroken line of contrary decisions. The Dissent sidesteps this consequence by assuming that distinctions of dual and unified sovereignty were uppermost in Congress's thoughts, see Dissent at 1196–97, but the assumption is belied by the drafters' evident and exclusive focus on the trend toward increased political autonomy for the District. And, rather than address the meaning that Congress gave the word "Federal" in related legislation that was explicitly noted in the drafting of the Speedy Trial Act, the Dissent appears to rest largely on the constitutional status of the District and congressional treatment of it in unrelated contexts. See Dissent at 1198–99 (discussing All Writs Act, Anti–Injunction Act, double jeopardy consequences of prosecutions under U.S. and D.C.Code provisions).

On this record, then, we find no basis whatever for concluding that Congress meant § 3172's reference to "Federal criminal offense" to include D.C. offenses when they happened to encompass conduct made criminal by federal law. Instead, Congress hewed to the course set four years earlier, treating the District the same as the states.

To refute these inferences as to congressional intent, amici suggest that the combi-

---

**8.** While in *Palmore v. United States,* 411 U.S. 389, 395–96, 93 S.Ct. 1670, 1675–76, 36 L.Ed.2d 342 (1973), the Court declined to treat D.C.Code provisions as "statute[s] of any state" within the meaning of former § 1257(2) (providing appellate jurisdiction over decisions rejecting a federal law challenge to a state statute), the decision is completely consistent with our conclusion that D.C. code offenses are not "federal offenses". In fact, the *Palmore* court held that defendants charged with D.C.Code offenses can be treated like "citizen[s] of any of the 50 states when charged with a violation of state criminal law" in that they are not guaranteed trial before an Article III judge for local offenses. 411 U.S. at 390–91, 397–410, 93 S.Ct. at 1672–73, 1676–83. And the Court relied in part on the 1970 Court Reform Act, noting its goal of "establish[ing] an entirely new court system with functions essentially similar to those of the local courts found in the 50 States of the Union with responsibility for trying and deciding those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact beyond the local jurisdiction." *Id.* at 409, 93 S.Ct. at 1682 (citing legislative history).

nation of D.C. and federal prosecutor in the person of the U.S. Attorney creates a unique practical hazard: under *Robertson* the U.S. Attorney can transfer cases to the district court "in order to avoid an anticipated unfavorable evidentiary or suppression ruling, or even to effect a unilateral 'continuance' of a scheduled trial date". Brief of Amici Curiae at 12. But the cases make clear that a U.S. Attorney cooperating with state authorities can do the same. In *Mejias* itself, for example, the defendants were arrested by a team of state and federal officers. They were initially prosecuted on state drug charges; when New York State prosecutors lost a suppression motion decided under the New York Constitution's version of the Fourth Amendment, the state indictments were dropped and the cases were transferred to the federal district court. See *Mejias*, 552 F.2d at 440–41. In *United States v. Lai Ming Tanu*, 589 F.2d 82 (2d Cir.1978), the prosecutions were the product of a joint state-federal undercover operation. The defendants were first charged in state court in order to take advantage of heavier sentences, but the state court eventually dismissed the indictment against defendant Tanu on Sixth Amendment and state statutory speedy trial grounds. See *id.* at 84. Yet the Second Circuit held that the original state arrest did not trigger § 3161(b)'s 30–day clock. Thus the state arrest rule originated in a case where the federal prosecution served as a backstop to an aborted state proceeding and has since been applied in similar cases. So the prosecutor's ability to use the state arrest rule for tactical advantage provides no distinction.

*Mejias* and *Lai Ming Tanu* also illustrate the now well-established principle that a state arrest does not start the clock no matter how extensive the federal involvement in the original arrest. See also *Adams*, 694 F.2d at 202 ("regardless of the degree of federal involvement in a state investigation and arrest, only a *federal* arrest will trigger the running of the time period set forth in 18 U.S.C. § 3161(b)") (emphasis in original); *Iaquinta*, 674 F.2d at 267–68 (noting that rule applies even where federal involvement in joint investi-

gation was "extensive" or "substantial"); cf. *United States v. Manuel*, 706 F.2d 908, 914–15 (9th Cir.1983) (cooperation between federal and tribal authorities does not transform tribal arrest into federal arrest).

Appellees also argue that our reading of the Act gives the U.S. Attorney an unfair tactical advantage, on the theory that it enables him to "park" cases in Superior Court to avoid § 3161(b)'s strict 30–day clock. If a defendant showed that the U.S. Attorney deliberately arrested him on D.C. charges and secured a Superior Court indictment in order to gain time to gather additional evidence for a federal prosecution, he might have a valid due process claim for pre-indictment delay. See *Mills*, 925 F.2d at 464. As previously noted, however, the panel found that there was no evidence *here* that the U.S. Attorney made transfer decisions to evade the strictures of the Act. See *id.* at 460–61; see also Affidavit of Charles J. Harkins, Jr., *reprinted in United States v. Holland*, 729 F.Supp. 125, 134–35 (D.D.C.1990) (Assistant U.S. Attorney asserts that *in making transfer recommendations he did not consider procedural history, plea posture, or amount of time a case had been pending for speedy trial purposes*).

The special role of the U.S. Attorney is, of course, an implementation of the concept of unified sovereignty. Appellees see support for their position in that conceptual unity. As the Act is intended to "give real meaning" to the Sixth Amendment's guarantee, H.R.Rep. No. 1508 at 11, *reprinted in* 1974 U.S.C.C.A.N. at 7404, they argue that it should receive a parallel construction. And the application of the Amendment to pre-indictment delay appears to depend in part on arrest and indictment having been made by the same sovereign. See *United States v. MacDonald*, 456 U.S. 1, 10 n. 11, 102 S.Ct. 1497, 1503 n. 11, 71 L.Ed.2d 696 (1982) (dicta); Wayne R. La-Fave & Jerold H. Israel, *Criminal Procedure* 686 (1985); but see Dissent at 1204 (discussing circumstances under which a state arrest triggers Sixth Amendment protection for later federal charge).

But the Act is not intended to track the Sixth Amendment. Within the set of cases covered, it establishes bright-line rules assuring minimum speed, while at the same time preserving defendants' Sixth Amendment claims in full. See 18 U.S.C. § 3174. And as *MacDonald post-dates* the passage of the Speedy Trial Act, it is hard to see how its emphasis on issues of sovereignty could have informed congressional intent.[9]

Moreover, although the goal of giving the Act an interpretation parallel to the Sixth Amendment is doubtless of value, the District's unified sovereignty in some ways militates against appellees' claim, as it affords defendants here advantages not shared by state defendants. First, by appellees' own contention, a District arrest will more often start the running of Sixth Amendment speedy trial rights than a similar state arrest. The argument that the *Robertson* rule gives the U.S. Attorney unlimited discretion to transfer cases from Superior Court "months, even years" after the initial arrest, Brief of Amici Curiae at 12, ignores the Sixth Amendment's role. Indeed, the panel remanded the present case to the district court for consideration of the constitutional claim, see *Mills*, 925 F.2d at 465–66, a remand we here affirm.

■ Defendants also receive greater double jeopardy protection in the District: successive D.C. and federal prosecutions for the same conduct are subject to the bar on double jeopardy, see *Robertson*, 810 F.2d at 257; *United States v. Alston*, 609 F.2d 531, 537 n. 31 (D.C.Cir.1979) (dicta), whereas successive state and federal prosecutions are not, see *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois*, 359 U.S. 121, 132–33, 79 S.Ct. 676, 682–83, 3 L.Ed.2d 684 (1959).

Finally, the legislative history explaining Congress's decision not to apply the Speedy Trial Act to the Superior Court itself lends inferential support to our decision. The

Committee Report noted that the lack of a speedy trial statute for the Superior Court might encourage the U.S. Attorney to engage in "forum shopping", given his overlapping D.C. and federal jurisdiction, but the Report suggested that if this became a problem "*Congress* would have an obligation ... to remedy the situation through future legislation." H.R.Rep. No. 1508 at 49, *reprinted in* 1974 U.S.C.C.A.N. at 7441 (emphasis added). Although the specific congressional decision was simply that the Act as a whole should not apply to Superior Court cases, the legislative history indicates recognition of the U.S. Attorney's special role, recognition that did not sway Congress from adopting language in § 3161(b) that addresses solely federal complaints and their attendant arrests. Appellees would have us remedy the "forum shopping" that might occur in some transfer cases by (in effect) applying the Act to Superior Court cases later transferred to federal court. That is part of the more general problem that Congress reserved to itself. The case is in this respect similar to *Public Citizen v. Young*, 831 F.2d 1108 (D.C.Cir.1987), where the legislative history revealed congressional recognition of one possible change in scientific presuppositions and an expectation that Congress would address the change if it occurred. There we inferred an intent to handle related but different changes in scientific understanding the same way. See *id.* at 1115–16, 1117–18. We find the same inference appropriate here.

\*　　\*　　\*

Accordingly, we reaffirm *Robertson* and hold that only an arrest in connection with *federal* charges triggers § 3161(b) of the Speedy Trial Act. We remand the cases to the district court for it to consider defendants' Sixth Amendment claims. See *Mills*, 925 F.2d at 464–65.

*Reversed and remanded.*

---

**9.** The dissent makes a puzzling suggestion that our decision deprives District defendants and citizens of the benefits of speedy trial legislation. See Dissent at 1200–01. But it was Congress's decision not to apply the federal statute to Superior court, see above at 1191, leaving the

District free, under its home rule powers, District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), to follow the states that have chosen to adopt special rules.

**1194**

SILBERMAN, Circuit Judge, *concurring:*

The case seems to me to be very close, because Congress did not directly address the issue presented, and I can find little convincing evidence from which to infer its intent. The dissent's forceful criticism of some of *Robertson*'s rationale is beside the point; the question now is which interpretation of the statute better accords with the language and legislative history. On balance, I think the majority has the better of the analysis. For that reason, and because I believe that in a close *en banc* case prior precedent is entitled to some respect, I join the majority opinion. *See Save Our Cumberland Mountains, Inc. v. Hodel,* 857 F.2d 1516, 1534 (D.C.Cir.1988) (en banc) (Starr, J., dissenting). I do so notwithstanding my distaste for the United States Attorney's prosecutorial practices that gave rise to this case, practices which relate to his insistence on bringing drug cases in our district court that apparently would not be brought in federal court elsewhere.

SENTELLE, Circuit Judge, with whom MIKVA, Chief Judge, and WALD, HARRY T. EDWARDS, and RUTH BADER GINSBURG, Circuit Judges, join, dissenting:

Today we revisit *United States v. Robertson,* 810 F.2d 254 (D.C.Cir.1987), and the question of whether a District of Columbia arrest or complaint triggers the guarantees of the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1988) (the "Act"). The majority apparently admits that the *Robertson* analysis is lacking, but at the same time counsels against throwing out its ruling with its reasoning. Instead it recites additional policy concerns to preserve the *Robertson.*

We respectfully dissent. In our view this is one of the unfortunate cases where the baby should go with the bathwater. New analysis or not, the majority ultimately relies on a view of the relationship between the United States Government and the District of Columbia that is at odds with our constitutional structure, caselaw, and experience.

**I.**

We begin by noting the severe problems underlying the *Robertson* decision. We do so in part to make it entirely clear that the majority is rightly abandoning much of the *Robertson* reasoning, not merely "somewhat modify[ing] our statutory analysis." Majority at 1188. We do so also to foreshadow the ultimate problem that remains in the new analysis the majority offers, and that must remain in any attempt to salvage the *Robertson* result.

In *Robertson,* a panel of this Court concluded that "a District of Columbia arrest should be treated as a state arrest" for the purposes of the Act. 810 F.2d at 256. State arrests do not start the speedy trial clock ticking, for reasons stemming from the dual sovereignty principle which "recognizes that the federal government is not bound by the actions of state authorities and that successive state and federal prosecutions are constitutionally permissible." *United States v. Mejias,* 552 F.2d 435, 441–42 (2d Cir.1977).

Though the *Robertson* panel explicitly recognized that the District of Columbia "most assuredly is not" an independent sovereign, it nonetheless found two "sound reasons for analogizing District arrests to state, rather than federal, arrests" for speedy trial purposes. 810 F.2d at 257. First, it hypothesized that applying the Act to District arrests might create "[p]ressure to shunt mixed-jurisdiction cases onto the federal side." *Id.* Second, it surmised that the Act's application might cause inappropriate interference with local affairs, thereby exacerbating District-federal tensions. *Id.* We note that both of these arguments rest on policy analysis, not legal analysis.

That said, even the policy predictions at the heart of the *Robertson* decision have proven unsustainable given subsequent experience. Rather than removing mixed-jurisdiction cases from federal court, the *Robertson* rule seems only to have allowed the federal caseload to grow ever larger. Witness the bulk of transfer cases now before

us.[1] Further, it is difficult for us to comprehend how such transfer programs show respect for local institutions. To the contrary, it appears that the rule may impose substantial costs on D.C. Superior Court, by burdening its docket with cases that will ultimately move to U.S. District Court.

The problems with *Robertson*'s predictions are so plain that the majority today makes no extended effort to defend them. In fact, it hardly mentions the panel opinion at all. Still, as we discuss below, the fundamental problem with *Robertson*—and with any attempt to defend its ruling—remains evident in today's opinion. Like *Robertson*, the majority's opinion ultimately depends upon the dubious proposition that practical considerations underpinning the dual sovereignty rationale have application in the District of Columbia.

## II.

The first half of the majority opinion today involves a new statutory analysis, one that appears to replace the policy predictions in *Robertson*. Looking at 18 U.S.C. § 3161(b), the majority notes that the Act's trigger mechanism is the arrest or service of summons "in connection with such charges" and that the likely referent for "such charges" is the term "offense" used earlier in the same section; "offense," of course, is defined as a "Federal criminal offense" in 18 U.S.C. § 3172. Properly read, then, an arrest starts the clock, the majority notes, only if it is " 'in connection with' " federal charges. Majority at 1188.

Looking at the cases before us, there is no doubt that the initial arrests were "in connection with" the "Federal criminal offense[s]" ultimately brought against Mills and Wonson. The indictments filed in District Court charged each appellee with possession with intent to distribute the same cocaine alleged in the Superior Court complaints and indictments.

The majority attempts to disconnect the plain connection between Mills's and Wonson's arrests and the offense charged against them in District Court through a redefinition of the term "arrest." Mills and Wonson, we are told, were not really arrested when they were cuffed, read their rights, and placed in jail. Rather, they were arrested only when a "Federal criminal offense" was formally charged against them. The majority further argues that a District complaint cannot charge a "Federal criminal offense" because it involves violations of the D.C.—not U.S.—Code.

In our view, even *assuming* the majority's reading of the term "arrest" is correct, its conclusion is not. We think a formal District of Columbia complaint—charging the very same substantive violation as that ultimately encompassed in a U.S. District Court indictment—*does* charge a "Federal criminal offense." The basic conduct at issue is the same. The prosecutor bringing charges does not change.[2] The identity of the sovereign involved remains the United States; thus, there is no affront to a separate sovereign's criminal laws. The *only* difference between the two is the initial papering decision by the United States Attorney's office—a choice between citing the relevant D.C. or U.S.Code provision. To rest on such a distinction as the basis for ascertaining the presence or absence of a federal criminal offense is, we believe, an exercise in the elevation of form over substance.

The majority defends its conclusion that a District complaint cannot charge a federal offense with two arguments. First, it states that appellees' view—now ours—disregards the definition of "offense" as a "Federal criminal offense," and the fact that "such charges" in § 3161(b) must refer back to a federal offense. Majority at 1189. But, this argument only spins us in circles. To state that a District complaint

---

1. Amici point to almost a dozen cases that could be affected by our ruling today; all were transferred to U.S. District Court as part of a new Department of Justice policy regarding drug offenses. *See* Amici Brief, Appendix.

2. The only exception to the general authority of the U.S. Attorney to determine when and how to prosecute crimes in the District—one not applicable to this case—is the power of the D.C. Corporation Counsel to pursue certain minor offenses. *See* D.C.Code § 23–101(a), (b) (1989).

cannot charge a federal offense simply because it cites a D.C.Code provision rather than a U.S.Code provision for the same substantive offense is tautology, not reasoning. The second argument gives us more reasoning, but in doing so resuscitates the fundamental problem underlying the *Robertson* panel decision. The view that a District complaint can involve a federal offense is, the majority argues, "inconsistent with the undisputed rule that a *state* arrest does not trigger the Speedy Trial Act's clock, even if the arrest is for conduct that is the basis of a subsequent indictment for a federal offense." Majority at 1189. Simply put, the majority is back to a reliance on policy rationales underlying the dual sovereignty principle, though now in the context of complaints rather than arrests.

### III.

The majority's suggestion that appellees' reading of the statute "disregards § 3172's definition of 'offense' as a 'Federal criminal offense' ...," Majority at 1189, depends on the implication that the District and its Code are inherently not federal in nature.[3]

This implication, however, is simply wrong. Any analysis of the District and its instruments must begin with the Constitution. There the Founders made plain that the District is a federal entity. As *Robertson* acknowledged, the District "most assuredly is not [a separate sovereign]." 810 F.2d at 257. Article I, § 8, cl. 17 of our Constitution itself states that

[t]he Congress shall have Power ... [t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may ... become the Seat of the Government of the United States.

Lingering questions on the status of the District may be resolved with a look at Supreme Court precedent. *See, e.g., Hepburn v. Ellzey,* 6 U.S. (2 Cranch) 445, 2 L.Ed. 332 (1804) (Marshall, C.J.) (Plaintiffs alleged that the District is a "State," but the Court found that "the members of the American confederacy only are the States

contemplated in the constitution"); *National Mutual Ins. Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 588, 69 S.Ct. 1173, 1176, 93 L.Ed. 1556 (1949) (Jackson, J.) ("In referring to the 'States' in the fateful instrument which amalgamated them into the 'United States,' the Founders obviously were not speaking of states in the abstract.... We therefore decline to overrule the opinion of Chief Justice Marshall ... that the District of Columbia is not a state within Article III of the Constitution."). Therefore, the definition of "offense" as a "federal criminal offense" does not automatically exclude offenses against the Code of the District of Columbia. Under the Constitution, the term "federal" would seem ordinarily to include rather than exclude the District of Columbia.

Moreover, as regards the status of D.C.Code charges, this Court has explicitly held that

[v]iolations of the District of Columbia Code and violations of the United States Code are all crimes against a single sovereign, namely, the United States.... All crimes prosecuted under the District of Columbia Code are maintained in the name of the United States.... Individuals convicted of crimes under either Code are committed to the custody of the Attorney General of the United States.... The Attorney General can commit violators of the District of Columbia criminal code to federal correctional facilities.... District of Columbia Code offenders properly incarcerated in federal penitentiaries are subject to parole review before the United States Parole Commission rather than the District of Columbia Parole Board.... The District of Columbia Court Reform and Criminal Procedure Act, Pub.L. No. 91–358, tit. I, 84 Stat.475 (1970) (codified at D.C.Code § 11–101 *et seq.* (1973)) did not vitiate the essential character of the District of Columbia as an arm of the sovereign United States.

*Goode v. Markley,* 603 F.2d 973, 976 (D.C.Cir.1979) (citations omitted) (Mac-

---

3. *See, e.g.,* Majority at 1190 n. 6 ("The background assumption that 'federal offenses' do not encompass purely District of Columbia crimes....").

Kinnon, J.), *cert. denied,* 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980).

Given the constitutional status of the District and our holding in *Goode,* we cannot accept the majority's claim that reading a D.C. charge to be a federal charge is "inconsistent with the undisputed rule that a *state* arrest does not trigger the Speedy Trial Act's clock...." Majority at 1189–90. We, thus, take the majority's position to be not that the District is a state but that we should treat the District as a state for purposes of this particular statute.

The majority defends this proposition with a discussion of other settings where Congress has, in exercising its plenary power over the District, chosen to treat it as a state. In doing so, the majority focuses on the treatment of the District of Columbia Code in selected provisions of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat.473 ("Court Reform Act"), suggesting by analogy that we ought to construe the term "federal" in § 3172 to exclude the District of Columbia.

It begins by laying great stress on the fact that, in a single section of that Act, Congress used the term "federal" in a fashion that excludes the D.C.Code. *See* Majority at 1190. Indeed, Congress did provide that the United States District Court for the District of Columbia is to retain jurisdiction over

[a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense.

D.C.Code § 11–502(3).

The value of this language in interpreting the term "federal" in the Act now before us is, however, dubious at best. Congress was crystal clear in writing this provision, excluding D.C. offenses from "Federal offenses" with explicit and complete language; it made manifest its intention to exercise its plenary power to overcome the presumptive treatment of the District as a federal entity for purposes of this section. Conversely, in the Act now before us, Congress included absolutely no reference to "law applicable exclusively to the District of Columbia" before using the term "Federal criminal offense." *See* 18 U.S.C. § 3172. It nowhere evidenced any intention to give the term "federal" a meaning that might exclude the District.

The majority might retort that the Court Reform Act's use of the word "federal" is not the determinative issue, but its general treatment of the District, its Code and courts, as state-like entities is. This point is apparent in the majority's references to 28 U.S.C. § 2113 (references to "state courts" include the District of Columbia Court of Appeals); 28 U.S.C. § 1451 (Superior Court is treated as a "state court" for purposes of removal jurisdiction); 28 U.S.C. § 1257 ("highest court of a State" includes the D.C. Court of Appeals for purposes of U.S. Supreme Court jurisdiction); 28 U.S.C. § 1366 (laws of United States do not include laws applicable exclusively to D.C. in jurisdictional statute of U.S. District Court for the District of Columbia). Majority at 1190.

There are deep difficulties with this argument. As regards the majority's reliance on the several provisions of the Court Reform Act which specify that D.C. courts are to be treated as state courts, we note that the Supreme Court has held that

[n]or does it does it follow from the decision to treat the District of Columbia Court of Appeals as a state court that the District Code was to be considered a state statute.... We are entitled to assume that ... Congress legislated with care, and that had Congress intended to equate the District Code and state statutes ..., it would have said so expressly, and not left the matter to mere implication[5]

---

[5] An express provision "would have been easy," *Farnsworth v. Montana,* 129 U.S. 104, 113, 9 S.Ct. 253, 255, 32 L.Ed. 616 (1889), as demonstrated by specific provisions in the United States Code concerning the District of Columbia.

*Palmore v. United States,* 411 U.S. 389, 395, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973). In sum, if Congress had wished to treat the Code as a state instrument in the Act now before us, it needed only to have

said so. Absent such a declaration, however, we ought not imply one from its treatment of D.C. courts under a completely different Act of Congress.

This point was driven home by this Circuit in *Goode,* 603 F.2d at 976 ("The District of Columbia Court Reform and Criminal Procedure Act ... did not vitiate the essential character of the District [and its Code] as an arm of the sovereign United States."). *See also Milhouse v. Levi,* 548 F.2d 357, 360 n. 6 (D.C.Cir.1976) ("[V]iolation of the criminal provisions of the District of Columbia Code are considered offenses against the laws of the United States notwithstanding the local nature of the court system"); *United States v. Greene,* 489 F.2d 1145, 1150 (D.C.Cir.1973) ("Thus a violation of the District of Columbia Code has been held to be an offense against the United States ..."); *United States v. Perez,* 488 F.2d 1057, 1059 (4th Cir.1974) (Court Reform Act's treatment of D.C. courts did not repeal the D.C.Code's status as a "law[ ] of the United States" under 18 U.S.C. § 3231).

In addition, we note that the status of the D.C. court system under the Court Reform Act itself is not as clear as the majority suggests. While some sections do *require* these courts to be treated as state courts, others do not. Congress has not, for example, plainly extended the prohibition upon the issuance of federal injunctions staying state court proceedings, *see* 28 U.S.C. § 2283, to District proceedings. *See Pernell v. Southall Realty,* 416 U.S. 363, 368 n. 4, 94 S.Ct. 1723, 1726 n. 4, 40 L.Ed.2d 198 (1974); *Family Div. Trial Lawyers v. Moultrie,* 725 F.2d 695, 701 n. 7 (D.C.Cir.1984); *Spivey v. Barry,* 665 F.2d 1222, 1229 & n. 16 (D.C.Cir.1981). Congress has also failed to exclude D.C. courts from those "established by Act of Congress" that may issue writs under the All Writs Act. 28 U.S.C. § 1651. Despite the

existence of a separate writ statute in the D.C.Code, this Circuit has nonetheless ruled that local courts may issue writs under either the U.S. or D.C. provisions. *United States v. Cogdell,* 585 F.2d 1130, 1133–34 (D.C.Cir.1978), *rev'd on other grounds sub nom. United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Moreover, Congress has granted to the U.S. District Court for the District of Columbia the authority to hear pendent D.C.Code criminal offenses, *see* D.C.Code § 11–502(3), but not state offenses. And, of course, the United States Attorney, the "federal prosecutor," functions in the D.C. courts. This mixed treatment of the D.C. courts by Congress in the Court Reform Act itself strongly suggests that the majority's citation to a few provisions is hardly dispositive of this case.[4]

As with the District's courts, so too with its Code. While it is sometimes treated as a state instrument, there are other occasions in which it remains emphatically federal. This inconsistent treatment within the Court Reform Act itself again suggests that an analogy drawn to only some of its sections is far from useful; it also reinforces the wisdom of following the Constitution absent a clear statement from Congress to the contrary.

To begin, in pendent criminal cases—where defendant is charged under both the U.S. and D.C.Codes—this Court has treated the D.C.Code as a second federal violation by refusing to enforce multiple punishments for the same substantive offense, despite the enactment of the Court Reform Act. *See, e.g., United States v. Dorsey,* 591 F.2d 922, 938 (D.C.Cir.1978) ("[I]n enacting both the federal and local criminal codes, [Congress] acts as a single sovereign. This court repeatedly has been required to determine whether Congress intended to subject a defendant to multiple

---

4. Other indicia of federal status appear in the D.C. Rules of Criminal Procedure. *E.g.,* Rule 5–I (if defendant is arrested outside of the District pursuant to a Superior Court warrant, he may be removed to the District under the Federal Rules of Criminal Procedure rather than through extradition proceedings); Rule 20 (D.C.Code violators outside the District may

waive local trial and consent to disposition in U.S. District Court where located), *see United States v. Ford,* 627 F.2d 807, 812 n. 5 (7th Cir.) (upholding application of Rule 20), *cert. denied,* 449 U.S. 923, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980); Rule 40 (Superior Court may release or detain U.S.Code offenders in certain circumstances).

punishments for a single act or transaction under similar provisions in the federal and District of Columbia criminal codes."). In addition, as *Goode* discussed, the Court Reform Act did not eliminate the United States Attorney General's authority to incarcerate D.C. prisoners, who are considered to have committed crimes against the United States, and are classified for purposes of incarceration as federal prisoners. *See* D.C.Code § 24–425 (1981). Finally, we note that in *Palmore* the Supreme Court itself found that even under the Court Reform Act, D.C.Code statutes are not equivalent to state statutes for purposes of appeal to the Supreme Court.[5]

In sum, the majority demands more of the Court Reform Act than it can deliver. Rather than providing clear lessons on the status of the D.C.Code—rather than providing us with a new "background assumption"—the Court Reform Act only sidetracks us into a murky swamp of ambiguity. On their face, the sections the majority emphasize have little bearing on the language now before us. In substance, they do suggest that Congress can and has treated D.C. like a state in some instances. But, this hardly proves that the Congress has created a new state-like status for the District and its Code in every statutory setting, and only more emphatically makes the case for treating them as federal instruments absent a plain congressional directive to the contrary.

Two final notes about the majority's statutory analogy are in order. First, if the use of the naked word "federal" in a statute is sufficient to carve out the District, we fear the majority may be laying down a nearly boundless rule this Court may come to regret. By way of example, in *Perez, supra,* the Fourth Circuit found that it could hear cases brought under the D.C.Code against prisoners held in the correctional facility at Lorton, Virginia, because the D.C.Code charges implicate "laws of the United States" within the meaning of 18 U.S.C. § 3231. 488 F.2d at 1057, 1059. Under the majority's analysis today, it strikes us that the Fourth Circuit decision might have to be reversed. Consequently, it seems, every D.C. criminal offense would have to be tried in the District of Columbia.[6] That said, we wonder, as the Fourth Circuit did, whether such a narrow reading of the statute would raise potential problems under Article III and the Sixth Amendment. Article III, § 2, cl. 3 provides that "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." Moreover, the Sixth Amendment states that

> [i]n all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury of the ... district wherein the crime shall have been committed, which district shall have been previously ascertained by law....

Simply put, the rule the majority proclaims today has the potential to rumble through our jurisprudence on the District in significant and possibly destructive ways.

Second, the Speedy Trial Act, passed by a different Congress, and relating to a different purpose, need not be read *in pari materia* with the Court Reform Act. *Cf. Fort Stewart Schools v. FLRA,* 495 U.S. 641, 649, 110 S.Ct. 2043, 2048, 109 L.Ed.2d 659 (1990); *Matthews v. CIR,* 907 F.2d 1173, 1178 (D.C.Cir.1990). Consequently, a bare analogy between the Court Reform Act and the one now before us is hardly dispositive. As the Supreme Court said in *United States v. Stewart,* 311 U.S. 60, 69, 61 S.Ct. 102, 108, 85 L.Ed. 40 (1940), "[n]o

**5.** We add that in *Key v. Doyle,* 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977), the Court held that D.C.Code statutes are also not "statutes of the United States" for purposes of Supreme Court appeal. The result, as the *Key* dissent made plain, is that, under that particular provision of the Court Reform Act, D.C.Code enactments are "mongrel statutes." *Id.* at 74, 98 S.Ct. at 288. This confusion under one section of the Court Reform Act over the status of the D.C.Code again suggests to us that that Act has

little plain guidance to offer on how we ought to interpret the statute now before us.

**6.** If the Fourth Circuit's decision would fall under the majority's analysis, Rule 20 of the D.C. Rules of Criminal Procedure would likely follow; under that provision, a D.C.Code violator outside the District may waive local trial and consent to disposition in the U.S. District Court where he is located.

mere collation of other statutes can be decisive in determining what the instant statute means.... [T]he fact that [even] the same Congress [used a phrase differently in a similar statute] is merely a straw in the wind."

Completing its discussion of the Court Reform Act, the majority returns to where *Robertson* began: the policy goals underlying the dual sovereignty principle. It resumes with a discussion of *Mejias*, the first dual sovereignty case in the Speedy Trial Act context, suggesting an analogy between that decision and the cases before us. *See* Majority at 1190, 1191–92. In *Mejias*, the Second Circuit found a state arrest could not charge a federal offense, despite the similarity in the underlying conduct, for two reasons. First, it relied on the difference in sovereign. 552 F.2d at 441–42. But, as we have discussed already, and as the majority must admit, the District is no separate sovereign. The majority recognizes this but quickly adds that the Second Circuit "also invoked a practical consideration that applies equally in the present context—the likelihood of immediate protective federal indictments, clogging the federal courts." Majority at 1190. We are asked, in sum, to analogize the District to a state—to discount its constitutional status as the Federal City—because of this apparently grave "practical consideration."

We cannot countenance this. To begin, we think it worth mentioning that the Second Circuit itself did not rest its holding on this practical concern, but only noted that it "bolster[ed]" its dual sovereignty rationale. 552 F.2d at 442. Second, the majority cites no case, save *Robertson*, in which any court has held the Act inapplicable solely because of "practical" concerns. Finally, we might here invoke the old saw, once bitten, twice shy. *Robertson*'s failure teaches well the lesson that this Court ought not allow "practical" policy concerns to drive its statutory analysis; we cannot understand why the majority today wishes to repeat the mistake.

The majority goes on to suggest that the District's unified sovereignty "in some ways militates against appellees' claim, as it *affords defendants here advantages not shared by state defendants.*" Majority at 1193 (emphasis added). Our colleagues point to the fact that Sixth Amendment speedy trial rights apparently begin running from the moment the accused is arrested in the District, but do not when he is arrested by a state and later tried in a federal court. They further note that successive D.C. and federal prosecutions for the same conduct are subject to the bar on double jeopardy, whereas successive state and federal prosecutions are not. Majority at 1193.

We find this "statutory analysis" puzzling. The majority's argument here seems completely grounded on policy considerations. Our colleagues apparently suggest that we ought to ignore the District's unified sovereignty because recognition of it in similar contexts has resulted in a body of law somehow unduly advantageous to District defendants. District of Columbia defendants, the majority seems to believe, do not need any more procedural protections.

If we can legitimately focus on the effects one ruling or another will have for criminal defendants in the District, might we not also focus on the effects its decision will have for the public at large? If we are going to indulge in policy analysis, ought we not at least ensure a full consideration of *all* policy ramifications? The purpose behind the Act, after all, is not only to vindicate the personal rights of the defendant, but also to promote important societal interests:

> [A] speedy trial is necessary to preserve the means of proving the charge, to maximize the deterrent effect of prosecution and conviction, and to avoid in some cases, an extended period of pretrial freedom by the defendant during which time he may flee, commit other crimes, or intimidate witnesses.

ABA Advisory Committee on the Criminal Trial, *Standards Relating to Speedy Trial*, Standard 1.1 (1968). *See also* S. 754, 93d Cong., 1st Sess. caption (1972); 116 Cong.Rec. 18845–46 (1970) (statement of Sen. Sam J. Ervin, Jr.) ("We must take

steps to make the sixth amendment right to a speedy trial—*a right so far denied both society as well as the defendant*—a reality after all these years") (emphasis added). Thus, though the majority bemoans the fact that unified sovereignty provides the District's criminal defendants special protections, it ignores the benefits accruing to the D.C. public from these protections.

The majority's concern for what it apparently deems the undue benefits that District defendants and perhaps citizenry receive from unified sovereignty as compared to those in the several states also ignores the plain fact that the defendants and citizenry of the states enjoy a parallel protection not available in the District. That is, they enjoy the protection of *state* statutory and procedural speedy trial protections.[7] Even as to those few states which have adopted no speedy trial statute or rule, the citizenry still has the option of demanding such protection from its legislature. The citizens of the District, not having a state government, are ultimately dependent upon Congress under the exclusive power granted it in Article I, § 8, cl. 17.[8]

That said, the fact that the District is treated as a federal entity rather than "like" a state in *both* the double jeopardy and Sixth Amendment contexts—despite the application of the dual sovereignty principle in *both* arenas—strongly suggests that it should be treated as a federal entity here as well.

In the double jeopardy context, this Court has rejected the joinder of D.C.Code and U.S.Code charges for the same underlying crime, finding that to do so would violate the Fifth Amendment's prohibition against being tried twice for the "same offence." U.S. CONST. amend. V. We have found that

[t]he Supreme Court decisions ... holding that both the federal and state governments may prosecute a defendant for the same act or acts, are grounded in principles of federalism: where the laws of two "sovereigns" are violated, each government may have a legitimate reason for exercising its power of criminal prosecution. But this underlying rationale is absent where a defendant is prosecuted for violating both laws of both the

---

7. At least the following states have set time limitations to assure the accused's right to a speedy trial:

Alaska Stat. § 12.10.010 (1990).
Ariz.Rev.Stat.Ann. § 13–114 (1989) (for specific times *see* 17 A.R.S., Ariz.Rules of Crim. Proc., Rule 8.2).
Ark.Code Ann. § 16–96–108 (Michie 1987) (*see* Ark. Rules of Crim.Proc., Rule 30.1).
Colo.Rev.Stat. § 16–5–401 (1986).
Conn.Gen.Stat.Ann. § 54–193 (West 1958).
Del.Code Ann., Super.Ct.Crim.Rules, Rule 48.
Fla.Stat.Ann. § 907.055 (West 1985) (for specific times *see* Fla.Stat.Ann.Rules of Crim. Proc., Rule 3.191).
Idaho Code § 19–106 (1987) (for specific times *see* Idaho Crim.Rules 7(f), 48).
Ill.Ann.Stat. ch. 38, ¶ 103–5 (Smith–Hurd 1980).
Ind.Code Ann., Rules of Crim.Proc., Rule 4 (Burns 1991).
Iowa Code Ann. §§ 802.1–802.9 (West 1979).
Kan.Crim.Proc.Code Ann. § 22–3402 (1988).
La.Code Crim.Proc.Ann. art. 578 (West 1981).
Mass.Gen.Laws Ann. ch. 277, § 63 (West 1991).
Md.Ann.Code art. 27, § 591 (1957).
Miss.Code Ann. § 99–1–5 (1972).
Mo.Ann.Stat. § 545.890 (Vernon 1987).
Neb.Rev.Stat. § 29–1207 (1987).
Nev.Rev.Stat. § 178.556 (1991).

N.M.Stat.Ann., Ct.Rules, Rule 5–604 (Michie 1986).
N.Y.Crim.Proc.Law § 30.10 (McKinney 1981).
N.C.Gen.Stat. § 15A–701 (1991).
Ohio Rev.Code Ann. § 2945.71 (Anderson 1987).
Or.Rev.Stat. § 131.105 (1991).
42 Pa.Cons.Stat.Ann., Rules of Crim.Proc., Rule 1100 (1989).
R.I.Gen.Laws § 12–13–7 (1981).
S.C.Code Ann. § 17–23–90 (Law. Co-op.1985).
S.D. Codified Laws Ann. § 23A–16–3 (1988).
Tenn.Code.Ann. § 40–2–101 (1990).
Va.Code Ann. § 19.2–8 (Michie 1990).
Wash.Rev.Code Ann. tit. 10, Super Ct.Crim. Rule 3.3 (West 1990).
W.Va.Code § 62–3–21 (1989).
Wis.Stat.Ann. § 971.10 (West 1985).

8. The majority suggests that the District is "free" under its home rule powers to adopt speedy trial rules. Majority at 1193 n. 9. As is familiar learning, however, Congress has retained "ultimate legislative authority," over the District, D.C.Code § 1–201(a), and reserved the right to legislate affirmatively for the District. D.C.Code § 1–206. Further, any act adopted by D.C. government must be submitted to Congress; a majority of both houses may nullify the measure within thirty calendar days. D.C.Code § 1–233(c).

United States and the District of Columbia, since the laws emanate from one sovereign.

*United States v. Alston,* 609 F.2d 531, 537 n. 31 (D.C.Cir.1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1281, 63 L.Ed.2d 603 (1980). The majority gives us no *reasons*—only "practical considerations"—why similar treatment of the District in the Speedy Trial Act context is somehow inappropriate.

In the Sixth Amendment context, the majority apparently admits that, given the validity of the Supreme Court's sovereignty-based analysis in *United States v. Mac-Donald,* 456 U.S. 1, 10 n. 11, 102 S.Ct. 1497, 1503 n. 11, 71 L.Ed.2d 696 (1982) ("Of course, an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign"), a state arrest is not likely to trigger the Sixth Amendment's guarantees *vis-a-vis* a later federal prosecution, while a District arrest is.

If, however, the District is appropriately treated as a federal entity for Sixth Amendment analysis, why is it not under the Act? This question is of particular importance because Congress, recognizing that the balancing test used to determine Sixth Amendment violations "provides no guidance to either the defendant or the criminal justice system," passed the Act explicitly to *"give real meaning to th[e] Sixth Amendment right."* H.R.Rep. No. 1508, 93d Cong., 2d Sess. 11, *reprinted in* 1974 U.S.C.C.A.N. 7401, 7404–05 (emphasis added). Under the view of the Act that our colleagues adopt today, it has absolutely *no* meaning in mixed-jurisdiction cases in the District of Columbia: by parking a case in Superior Court, the Act can be kept from applying indefinitely. Ironically, under the majority's view, the Sixth Amendment itself has more real bite for transferred defendants than the Act does.

The majority attempts to justify its departure from the Sixth Amendment analysis by claiming first that *MacDonald,* which recognized the sovereignty test for Sixth Amendment analysis, post-dated the Act and, thus, could not have informed congressional intent. Majority at 1193. True, *MacDonald* itself formally postdated the Act, but its reasoning—focusing on the relevant sovereign—surely cannot have come as a surprise. As the majority itself notes, a sovereign-based analysis was applied in the double jeopardy context well before the passage of the Act, providing a strong indication of its potential applicability in the speedy trial context. Majority at 1193. LaFave & Israel, whom the majority also cites, even suggested the *MacDonald* dicta, without direct reference to *Mac-Donald,* reasoning instead from the double jeopardy area in their 1984 edition of *Criminal Procedure.* 2 W. LaFave & J. Israel, Criminal Procedure § 18.1 at 401 (1984). Further, the majority itself charges Congress with knowledge of the practical concerns underpinning the dual sovereignty principle when it passed the Act; consequently, we are at a loss to understand why Congress would not be equally aware of the District's unique status under the Constitution and in our caselaw.

The majority next attempts to explain its failure to give real meaning to the Act's implementation of Sixth Amendment rights with a snippet of legislative history focusing on the Act's application to Superior Court. Majority at 1193. To be sure, Congress intended that the Act not apply to cases pursued entirely in D.C. Superior Court. However, this does not suggest, as the majority infers, that the U.S. Attorney need not abide by the Act when he moves a case from D.C. Superior to U.S. District Court.

Turning directly to the Committee Report upon which our colleagues rely, we acknowledge that Congress did discuss the possibility of "forum shopping" by the U.S. Attorney to avoid the Act's restrictions and concluded that the benefits of the local exemption—such as respect for local courts and political institutions—justified the risk. H.R.Rep. No. 93–1508 at 49, *reprinted in* 1974 U.S.C.C.A.N. at 7441. Any changes that might be needed, Congress said, would be left to future legislative action. *Id.* However, read in context, the reference to forum shopping appears directed at the

U.S. Attorney's opting *out* of federal court entirely and proceeding exclusively in local court, rather than by transferring cases from local *into* federal court without regard to the Act's time limits. Avoidance of the former sort would not harm local institutions or evidence any disrespect. The same is most manifestly not true here as experience since *Robertson* demonstrates.[9]

In short, the majority's failure to offer a legitimate reason why the application of the Act should differ from the application of the Sixth Amendment is emblematic of its failure to provide adequate legal reasoning for its exceptional treatment of the District and, thus, for its preservation of the *Robertson* rule. Merely shifting focus from the arrest to the filing of formal charges will not work. Reliance on another, unrelated and ambiguous statutory structure must fail. Replacing flawed policy predictions with new ones cannot do. Concern with the effect a contrary ruling might have on District defendants is unhelpful. Meager attempts at distinguishing double jeopardy and Sixth Amendment precedent are unavailing. It is our view that, if, after two tries at demonstrating the inapplicability of the Act to the District of Columbia, this is the best this Court can muster, it is time to throw the *Robertson* rule out along with its reasoning.

## IV.

At this juncture, we wish to make clear the consequences of our own statutory analysis. Simply recognizing the unified sovereignty of the District and, with it, the fact that a D.C.Code charge can constitute a "Federal criminal offense" does not mean that every D.C.Code charge triggers the Act's protections. The reason this is so, however, has nothing to do with the Court Reform Act or policy concerns, but rather with the Act's language and legislative history.

The term "judge" in § 3172 is defined as including only U.S. District Court judges and U.S. magistrates. There is no mention of D.C. Superior Court judges. In fact, the definition as originally proposed did include Superior Court judges but, for reasons alluded to above, Congress changed course. H.R.Rep. No. 93–1508 at 47, *reprinted in* 1974 U.S.C.C.A.N. at 7439–40. Thus, it seems natural to conclude that, while a D.C.Code violation is a federal criminal offense, such violations are only cognizable under the Act when transferred to District Court.

Again, however, the mere fact that a criminal defendant must be in U.S. District Court to receive the Act's protections does not mean that the D.C. charge is somehow irrelevant. A federal offense has still been charged by the D.C. complaint and, as the majority argues, the charge—not the courthouse—initiates the Act's application. This reading of the Act is supported by the treatment of cases transferred between federal districts. Assuming that charges remain pending, the initial charge—despite the change in courts—remains the operative moment for purposes of the Act. *See United States v. Colombo*, 852 F.2d 19, 23–24 (1st Cir.1988). The government itself also conceded this point at oral argument.

In sum, it is our view that, though a District Code violation may charge a federal offense, the Act only applies in District Court. Consequently, Superior Court, as was the wish of Congress, is excluded from the Act's strictures. But, when such charges initially raised in a D.C. complaint are brought to District Court, the Act cannot be avoided, and its application relates back to the D.C. charge.

---

9. The majority seems to admit that the Committee Report is not directly on point for its purposes, but suggests that where the legislative history reveals that Congress meant to preserve for future legislative action a similar but slightly different problem than the one before the Court, we should leave this too for Congress to handle. Majority at 1193. This might make sense when there is some evidence that the two problems—the one contemplated by Congress and the one raised before this Court—share something in common. In our view, however, the reference to forum shopping in the House Report has no bearing on the special type of evasion at issue here. Further, the congressional directive on the application of the Act—to give "real meaning" to the Sixth Amendment right—could not, in our view, provide clearer guidance.

## V.

One other facet of this case is worth mention. Even if we *assume* that the District is to be treated as a state under the Act, it strikes us that a District charge is nevertheless "in connection with" a federal charge when the basis underlying the two complaints is precisely the same.

In interpreting the dual sovereignty principle for purposes of the Sixth Amendment, some courts have suggested that even a state arrest may start the Amendment's clock ticking for a subsequent federal charge when the basis underlying the two prosecutions is, at heart, the same. *See, e.g., United States v. Marler,* 756 F.2d 206 (1st Cir.1985); *United States v. Cabral,* 475 F.2d 715 (1st Cir.1973); *United States v. Nixon,* 634 F.2d 306, 309 (5th Cir.) (Sixth Amendment clock runs at time of initial arrest "when the next indictment is for precisely the same offense and same transaction") (citing *Cabral*), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *United States v. Avalos,* 541 F.2d 1100, 1111 n. 20 (5th Cir.1976) (if state arrest for same charge later tried in federal court, Sixth Amendment attaches); *Gravitt v. United States,* 523 F.2d 1211, 1215 n. 6 (5th Cir.1975) ("For purposes of determining when the right to speedy trial attaches, the *basis* for arrest is critical") (citing *Cabral*); *United States v. De Tienne,* 468 F.2d 151, 155 (7th Cir.1972) (Sixth Amendment right attaches at time of state arrest if federal indictment "really only gild[s] the charge underlying [defendant's] initial arrest and the different accusatorial dates between them are not reasonably explicable."), *cert. denied,* 410 U.S. 911, 93 S.Ct. 974, 977, 35 L.Ed.2d 274 (1973); *Cf. United States v. Lai Ming Tanu,* 589 F.2d 82, 88 (2d Cir.1978) (leaving open question of whether Sixth Amendment right attaches on state arrest if the same charges later prosecuted in federal court).

While decided in the Sixth Amendment context, this application of the dual sovereignty principle seems useful in interpreting the term "in connection with" under the Act. Further, it appears pertinent to this case. Consider the test the First Circuit applies. Though noting it insufficient that state and federal charges arise from the same incident, the First Circuit finds the Sixth Amendment triggered when the federal charge does not differ in any way from the state charge and federal authorities were involved in the case from an early stage. *Marler,* 756 F.2d at 212. Applying these criteria, there is no way this rule, if adopted, would fail to control the cases before us and perhaps every D.C. charge directly translated into U.S.Code indictment. At the very least the Court owes more explanation as to why it rejects this important rule recognized by other jurisdictions in the Sixth Amendment context.

## VI.

The District of Columbia "is an exceptional community ... established under the Constitution as the seat of the National Government." *District of Columbia v. Murphy,* 314 U.S. 441, 452, 62 S.Ct. 303, 308, 86 L.Ed. 329 (1941). It is "as lasting as the States from which it was carved or the union whose permanent capital it became." *O'Donoghue v. United States,* 289 U.S. 516, 538, 53 S.Ct. 740, 746, 77 L.Ed. 1356 (1933). "Unlike either the States or Territories, the District is truly *sui generis* in our governmental structure." *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973).

Bearing the District's special status in mind, we cannot agree with the majority that, in the absence of a clear statutory mandate to treat a District Code violation as a state violation, we are free to craft such a rule. "We are not at liberty to seek ingenious analytical instruments" to avoid giving a congressional enactment the broad scope its language and origins may require. *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966).

Though this case may not have a significant impact on the interpretation of the Act beyond the District of Columbia's boundaries, it constitutes a substantial affront to the caselaw shaped to fit the Constitution's design, which plainly demarcates these few square miles as a uniquely federal space.

For this reason and those set forth above, we dissent.

