United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 5, 1997 Decided December 5, 1997 

 No. 96-3108

 United States of America, 

 Appellee

 v.

 William H. Seals, a/k/a Puddin, 

 a/k/a William Brooks, 

 Appellant

 No. 96-3109

 United States of America, 

 Appellee

 v.

 Gary W. Sweatt, 

 Appellant

 ---------


 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 95cr00284-01 & 03)

 ---------

 Daniel H. Bromberg, appointed by the court, argued the 
cause for appellant William H. Seals.

 Lisa K. Coleman argued the cause for appellant Gary W. 
Sweatt. John P. Dean, appointed by the court, was on brief.

 Mary-Patrice Brown, Assistant United States Attorney, 
argued the cause for the appellee. Eric H. Holder, Jr., 
United States Attorney at the time the brief was filed, and 
John R. Fisher, Thomas J. Tourish, Jr., and G. Bradley 
Weinsheimer, Assistant United States Attorneys, were on 
brief.

 Before: Williams, Ginsburg and Henderson, Circuit 
Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Karen LeCraft Henderson, Circuit Judge: The appellants, 
William Seals and Gary Sweatt, appeal their convictions on 
federal conspiracy, kidnapping and extortion charges. They 
contend that the Speedy Trial Act, 18 U.S.C. ss 3161 et seq., 
and Article III of the United States Constitution require 
dismissal of the indictment underlying their convictions. In 
addition, Sweatt argues that there was insufficient evidence 
to convict him of kidnapping and that the district court 
improperly sentenced him as a "career offender" under sec-
tion 4B1.1 of the United States Sentencing Guidelines (Guide-
lines). We affirm the appellants' convictions but vacate 
Sweatt's sentence and remand to the district court to resen-
tence him not as a career offender.

 I. BACKGROUND

 On August 2, 1995 Seals and Sweatt were arrested and a 
criminal complaint was filed against them in D.C. Superior 
Court, charging them with armed kidnapping in violation of 


D.C. Code Ann. ss 22-2101, 22-3202 (1981 & Supp. 1995). 
They were not, however, immediately indicted on these 
charges. After their arrest by Federal Bureau of Investiga-
tion (FBI) agents, the FBI and the D.C. Metropolitan Police 
Department continued their joint investigation into the kid-
napping. The investigation resulted in the arrest of two 
other suspects and additional evidence which persuaded the 
United States Attorney to alter his tentative decision to lodge 
D.C. charges against them and to instead indict them on 
federal charges. As a result, on October 31, 1995 a D.C. 
Superior Court grand jury returned an indictment in the 
United States District Court for the District of Columbia.

 Before trial Seals and Sweatt moved to dismiss the indict-
ment on Speedy Trial Act and constitutional (Article III) 
grounds. The lower court denied the motion, finding that the 
United States Attorney had not sent "the case back to D.C. 
Superior Court ... for the purpose of gaining additional time 
for federal prosecution." Pre-Trial Mot. Tr. 225. It further 
held that the Congress, with plenary authority over the 
District of Columbia, validly authorized the D.C. Superior 
Court, an Article I tribunal, to supervise a grand jury that 
can indict for both D.C. and federal offenses. Id. at 201.

 At the appellants' trial the Government presented evidence 
showing that Sweatt had assisted in detaining the kidnap 
victim and in retrieving the ransom money. There was no 
evidence, however, from which the jury could infer that 
Sweatt had either been present at or assisted in the abduction 
and transport of the victim across state lines. At the close of 
the Government's case, Sweatt moved for acquittal on the 
ground that he could not be found guilty of kidnapping unless 
he was shown to have participated in the abduction or trans-
port of the victim across state lines. His motion was denied.

 The district court charged the jury on the kidnapping and 
extortion counts of the indictment under three theories: (1) 
liability as a principal under 18 U.S.C. s 1201(a) (kidnapping) 
and 18 U.S.C. s 1951 (extortion); (2) liability as an aider and 
abettor under 18 U.S.C. s 2; and (3) liability as a Pinkerton 
co-conspirator (Pinkerton v. United States, 328 U.S. 640, 647-


48 (1946)). The jury returned a general verdict, finding both 
Seals and Sweatt guilty of conspiracy, kidnapping and extor-
tion. Seals and Sweatt were subsequently sentenced to iden-
tical, concurrent terms of imprisonment. They each received 
60 months for conspiracy, 240 months for extortion and life 
imprisonment for kidnapping.

 At sentencing, Sweatt argued that he should be sentenced 
under the November 1994 version of Chapter 4, Part B, of the 
Guidelines and that, according to the 1994 version, as modi-
fied by United States v. Price, 990 F.2d 1367 (D.C. Cir. 1993), 
he did not have the requisite number of prior convictions to 
qualify as a career offender. The district court disagreed, 
concluding that the November 1994 and November 1995 
versions of the Guidelines were substantially identical, the 
only difference being that the 1995 version of section 4B1.1 
contained amended Background Commentary. Thus, the 
lower court ruled that Sweatt's prior convictions of robbery 
and attempted distribution of heroin required that he be 
sentenced as a career offender under both the 1994 and 1995 
versions of section 4B1.1.

 II. DISCUSSION

 Despite the parties' contentions to the contrary, all of the 
appellants' claims involve the trial court's legal conclusions or 
its application of legal standards to the facts. Accordingly, 
we review their claims de novo. See United States v. Abdul-
Saboor, 85 F.3d 664, 667 (D.C. Cir. 1996).

 A. Timeliness of Indictment

 The Speedy Trial Act (STA) provides that "[a]ny informa-
tion or indictment charging an individual with the commission 
of an offense shall be filed within thirty days from the date on 
which such individual was arrested or served with a summons 


in connection with such charges." 18 U.S.C. s 3161(b). The 
appellants contend that the clock began on the date of their 
August 1995 arrests and expired thirty days later in Septem-
ber 1995. They therefore argue that their October 1995 
indictment should be dismissed as untimely pursuant to 18 
U.S.C. s 3162(a)(1).1 We disagree.

 In United States v. Mills, 964 F.2d 1186 (D.C. Cir.) (en 
banc), cert. denied, 506 U.S. 977 (1992), we determined that 
"[u]nder the most natural reading" of section 3161(b), "an 
arrest starts the clock only if it is 'in connection with' federal 
charges" and thus, "[i]f ... the arrest [is] accompanied by a 
complaint charging violations of the D.C. (not U.S.) Code, it 
[is] not 'in connection with' federal charges." 964 F.2d at 
1189 (emphasis original). Further, we concluded that the 
remedial provision for an untimely indictment, 18 U.S.C. 
s 3162(a)(1), "also suggests that the [STA] is triggered only 
by arrests that are accompanied by the filing of a federal 
complaint against the defendant." Id. (emphasis original); 
see also id. at 1193 (Congress adopted "language in 3161(b) 
that addresses solely federal complaints and their attendant 
arrests") (emphasis added). We therefore held that because 
the Mills defendants were initially charged with violations of 
the D.C. Code, the section 3161(b) clock did not start on their 
arrest dates and thus the federal indictments (returned, in 

__________
 1 This subsection provides:

 If, in the case of any individual against whom a complaint is 
 filed charging such individual with an offense, no indictment or 
 information is filed within the time limit required by section 
 3161(b) as extended by section 3161(h) of this chapter, such 
 charge against that individual contained in such complaint shall 
 be dismissed or otherwise dropped. In determining whether to 
 dismiss the case with or without prejudice, the court shall 
 consider, among others, each of the following factors: the 
 seriousness of the offense; the facts and circumstances of the 
 case which led to the dismissal; and the impact of a reprosecu-
 tion on the administration of this chapter and on the adminis-
 tration of justice.

18 U.S.C. s 3162(a)(1).


one instance, one year after arrest) were not untimely. 964 
F.2d at 1188-93.

 Our Mills decision disposes of the appellants' STA claims. 
Their August arrests, accompanied by the filing of D.C. 
charges only, cannot be deemed arrests "in connection with" 
federal charges and thus cannot start the STA clock. None-
theless, Seals and Sweatt invite us to fashion an exception to 
Mills for the "unusual" circumstances of this case which (in 
their view) consist of (1) the FBI's involvement in the arrests 
and its continuing role in the post-arrest investigation of the 
kidnapping, (2) the United States Attorney's "contemplation" 
of federal charges when they were arrested and charged with 
violations of the D.C. Code, (3) the alleged tentativeness of 
the U.S. Attorney's initial decision to bring D.C. rather than 
federal charges and (4) the identity of the prosecuting person-
nel. We decline their invitation.

 First, the fact that the FBI was actively involved in their 
August arrests does not make them arrests "in connection 
with" federal charges. See United States v. Gerald, 5 F.3d 
563, 566 (D.C. Cir. 1993) (where arrest was followed by 
indictment for D.C. Code violations, fact that defendant ar-
rested by federal law enforcement officer held not to trigger 
STA clock), cert. denied, 511 U.S. 1144 (1994); cf. Mills, 964 
F.2d at 1192 (recognizing "the now well-established principle 
that a state arrest does not start the clock no matter how 
extensive the federal involvement in the original arrest") 
(emphasis added). Nor does the fact that the FBI actively 
participated in the post-arrest investigation make Seals's and 
Sweatt's August apprehension an arrest "in connection with" 
federal charges. See United States v. Iaquinta, 674 F.2d 260, 
262-69 (4th Cir. 1982) (federal investigation undertaken after 
defendant's arrest and indictment on state charges and lead-
ing to discovery of additional evidence prompting federal 
indictment did not mean STA clock began on date of original 
arrest); cf. Gerald, 5 F.3d at 565 (STA clock not triggered by 
original arrest on D.C. charges even though prosecutor subse-
quently decided to seek federal indictment as result of post-
arrest review of defendant's criminal record and seriousness 
of D.C. charges); United States v. Candelaria, 704 F.2d 1129, 


1130 (9th Cir. 1983) (arrest by military police did not trigger 
STA clock despite subsequent FBI involvement).

 Second, whether the prosecutor contemplated the filing of, 
or only tentatively decided not to bring, federal charges at 
the time of the appellants' arrests is irrelevant to deciding 
when the clock starts. Cf. Iaquinta, 674 F.2d at 269 (sug-
gesting inappropriateness of probe into federal prosecutor's 
motives because prosecutor not required to file federal 
charges as soon as he has enough evidence to prosecute). At 
the very least, such an inquiry is proscribed by the long line 
of cases holding that a federal prosecution based on the same 
conduct as a failed state prosecution--and which is pursued in 
order to salvage the prosecution--is not prohibited by the 
STA because the state arrest does not start the STA clock. 
See Mills, 964 F.2d at 1189-90 (citing Second, Third, Fourth, 
Fifth, Seventh, Eighth and Ninth Circuit decisions for "the 
undisputed rule that a state arrest does not trigger the 
Speedy Trial Act's clock, even if the arrest is for conduct that 
is the basis of a subsequent indictment for a federal offense").

 Nor do the decisions upon which the appellants purport to 
rely--e.g., United States v. Benitez, 34 F.3d 1489, 1494 (9th 
Cir. 1994), cert. denied, 513 U.S. 1197 (1995); United States v. 
Cepeda-Luna, 989 F.2d 353, 357 (9th Cir. 1993)--require a 
different result. The cases do not authorize a wide-ranging 
judicial inquiry into the prosecutor's motives or the finality of 
his decisionmaking processes. Rather, they merely carve out 
a narrow exception to prevent prosecutorial manipulation of 
STA deadlines. The "ruse" exception is inapposite here 
because the court below expressly found that "there was no 
effort to manipulate the system to gain more time" (Pre-Trial 
Mot. Tr. 225) and the appellants do not contest the finding.

 Third, as the Government properly notes, the fact that the 
same personnel were responsible for prosecuting Seals and 
Sweatt in the D.C. Superior Court and United States District 
Court does not transform their arrests on D.C. charges into 
arrests "in connection with" federal charges. See Mills, 964 
F.2d at 1192-93 (rejecting claim that identity of non-federal 


and federal prosecutorial personnel triggers STA clock on 
date of arrest accompanied by filing of non-federal charges).

 Fourth, we reject the appellants' other arguments--name-
ly, that the STA's language, structure and purpose suggest 
that an arrest on D.C. charges merely establishes a "pre-
sumption" that the arrest does not trigger the STA clock and 
that the "presumption" is rebutted by the unique circum-
stances of this case. To the extent that the arguments have 
any merit, they are plainly foreclosed by Mills. See 964 F.2d 
at 1193 (section 3161(b) "addresses solely federal complaints 
and their attendant arrests") (emphasis added).2

 B. Constitutionality of Indictment

 D.C. Code Ann. s 11-1916(a) (1981 & Supp. 1995) (section 
1916(a)) provides that "[a] grand jury serving in the District 
of Columbia may take cognizance of all matters brought 
before it regardless of whether the indictment is returnable in 
the Federal or District of Columbia Courts." The appellants 
argue that the provision is unconstitutional because it vests 
the judicial power of the United States outside Article III and 
it does so by improperly empowering the executive branch.3

__________
 2 Thus, contrary to the appellants' argument, we decline to read 
section 3161(b) without reference to section 3162(a)(1) (see supra 
note 2). See Mills, 964 F.2d at 1189 ("There appears to be 
undisputed support among the circuits for this reading of the 
interplay between ss 3161(b) and 3162(a)(1)."). Similarly, we reject 
their assertion that the STA clock should be understood to start on 
the same date the Sixth Amendment clock starts. See id. at 1193 
("[T]he [STA] is not intended to track the Sixth Amendment. 
Within the set of cases covered, it establishes bright-line rules 
assuring minimum speed, while at the same time preserving defen-
dants' Sixth Amendment claims in full.").

 3 The appellants also claim that section 1916(a) deprives them of 
the constitutional safeguards associated with Article III supervision 
of federally-indicting grand juries. See Commodity Futures Trad-
ing Comm'n v. Schor, 478 U.S. 833, 848 (1986) ("Article III, s 1, 
serves both to protect the role of the independent judiciary within 
the constitutional scheme of tripartite government, ... and to 
safeguard litigants' right to have claims decided before judges who 


are free from potential domination by other branches of govern-
ment.... Although our cases have provided us with little occasion 
to discuss the nature or significance of the latter safeguard, our 
prior discussions of Article III, s 1's guarantee of an independent 
and impartial adjudication by the federal judiciary of matters within 
the judicial power of the United States intimated that this guaran-
tee serves to protect primarily personal, rather than structural, 
interests.") (internal quotation marks and citations omitted); Peretz 
v. United States, 501 U.S. 923, 929 (1991) (noting that Gomez v. 
United States, 490 U.S. 858, 864 (1989), had construed statute to 
avoid "substantial question whether a defendant has a constitutional 
right to demand that an Article III judge preside at every critical 
stage of a felony trial"); but cf. Palmore v. United States, 411 U.S. 
389, 400 (1973) (rejecting view "that criminal offenses under the 
laws passed by Congress may not be prosecuted except in courts 
established pursuant to Art. III [because] [i]n our view, ... there is 
no support for this view in either constitutional text or in constitu-
tional history and practice"); Swain v. Pressley, 430 U.S. 372, 382 
(1977) ("[T]he Constitution does not require that all persons 
charged with federal crimes be tried in Article III courts.").

 To the extent this claim is distinguishable from the appellants' 
other claims, it implicates personal, not structural, constitutional 
rights--insofar as such rights might exist in the grand jury context 
(about which we express no opinion here). Assuming the right 
exists and assuming it was violated as alleged, the appellants would 
not be entitled to a dismissal of the indictment unless the violation 
prejudiced them, which they do not contend and which the trial 
judge explicitly rejected. See Bank of Nova Scotia v. United 
States, 487 U.S. 250, 254 (1988) ("We hold that as a general matter, 
a district court may not dismiss an indictment for errors in grand 
jury proceedings unless such errors prejudiced the defendants."). 
While Bank of Nova Scotia involved violations of Fed. R. Crim. P. 
6(d) & (e), the decision plainly suggests that the analysis for 
constitutional errors is no different from that used to assess other 
types of errors. See id. at 256 ("It would be inappropriate to devise 
a rule permitting federal courts to deal more sternly with nonconsti-
tutional errors than with constitutional errors."). Moreover, if the 
petit jury ultimately returns a guilty verdict, any error committed 
at the grand jury stage is (with exceptions not applicable here) non-
prejudicial. See United States v. Mechanik, 475 U.S. 66, 70 (1986) 
("But the petit jury's subsequent guilty verdict means not only that 
there was probable cause to believe that the defendants were guilty 


 (1) Judicial Supervision of Grand Jury as 

 "Judicial Power of United States"

 The only reference to the grand jury in the Constitution is 
found in the first clause of the Fifth Amendment.4 The grand 
jury "has not been textually assigned, therefore, to any of the 
branches described in the first three Articles." United States 
v. Williams, 504 U.S. 36, 47 (1992).5 Accordingly, it has been 
described as "an institution separate from the courts, over 
whose functioning the courts do not preside." Id.; see also 
id. at 48 ("[I]n its day-to-day functioning, the grand jury 
generally operates without the interference of a presiding 
judge."); but cf. Blair v. United States, 250 U.S. 273, 278 
(1919) ("At the foundation of our federal government the 
inquisitorial function of the grand jury and the compulsion of 
witnesses were recognized as incidents of the judicial power 
of the United States."); Levine v. United States, 362 U.S. 
610, 617 (1960) ("The grand jury is an arm of the court and its 
in camera proceedings constitute a judicial inquiry.") (inter-
nal quotation omitted).

 The independence of the grand jury reflects the protective 
role it plays in our system of criminal justice: "Historically, 
this body has been regarded as the primary security to the 
innocent against hasty, malicious and oppressive persecution; 
it serves the invaluable function in our society of standing 

__________
as charged, but also that they are in fact guilty as charged beyond a 
reasonable doubt. Measured by the petit jury's verdict, then, any 
error in the grand jury proceeding connected with the charging 
decision was harmless beyond a reasonable doubt.") (note omitted).

 4 The Grand Jury Clause of the Fifth Amendment recites:

 No person shall be held to answer for a capital, or otherwise 
 infamous crime, unless on a presentment or indictment of a 
 Grand Jury, except in cases arising in the land or naval forces, 
 or in the Militia, when in actual service in time of War or public 
 danger;....

U.S. Const. Am. V, cl. 1.

 5 The grand jury's lineage is outlined in Hurtado v. California, 
110 U.S. 516 (1884), and dates back to at least 1164. Id. at 529.


between the accuser and the accused, whether the latter be 
an individual, minority group, or other, to determine whether 
a charge is founded upon reason or was dictated by an 
intimidating power or by malice and personal ill will." Wood 
v. Georgia, 370 U.S. 375, 390 (1962); accord Williams, 504 
U.S. at 47.6

 The grand jury does depend on the judiciary in its role as 
an investigative body: "A grand jury is clothed with great 
independence in many areas, but it remains an appendage of 
the court, powerless to perform its investigative function 
without the court's aid, because powerless itself to compel the 
testimony of witnesses." Brown v. United States, 359 U.S. 
41, 49 (1959), overruled on other ground by Harris v. United 
States, 382 U.S. 162 (1965); accord United States v. Calan-
dra, 414 U.S. 338, 346 n.4 (1974) ("[T]he grand jury must rely 
on the court to compel production of books, papers, docu-
ments, and the testimony of witnesses, and the court may 
quash or modify a subpoena on motion if compliance would be 
unreasonable or oppressive.") (internal quotation omitted). 
But even this dependence is limited as the grand jury must 
"remain 'free to pursue its investigations unhindered by 
external influence or supervision so long as it does not trench 
upon the legitimate rights of any witness called before it.' " 
Williams, 504 U.S. at 48-49 (quoting United States v. Dioni-
sio, 410 U.S. 1, 17-18 (1973)) (emphasis added).

 Moreover, an Article III judge's role in the grand jury's 
investigative process is often more attenuated as the respon-

__________
 6 Under the Fifth Amendment, an indictment is not required to 
initiate prosecution of a state "capital[ ] or otherwise infamous 
crime." See Hurtado, 110 U.S. at 538. Although the District is 
treated like a state in many respects--see, e.g., Palmore, 411 U.S. 
at 397 (1973) (in District of Columbia "Congress may also exercise 
the police and regulatory powers which a state legislature or 
municipal government would have in legislating for state or local 
purposes")--the Supreme Court has held that the prosecution of a 
D.C. Code offense carrying the possibility of "infamous punishment" 
may not be commenced other than by grand jury indictment or 
presentment as required by the Fifth Amendment. See United 
States v. Moreland, 258 U.S. 433 (1922).


sibility for issuing subpoenas and for accepting returned 
indictments is vested in United States magistrate judges who 
are not Article III judges. See Fed. R. Crim. P. 17(a) 
(subpoenas "shall be issued by United States Magistrate 
Judge[s]"); Fed. R. Crim. P. 6(e)(4) & 6(f) (indictment is to 
be returned to magistrate judge). Indeed, the significance 
attached to Article III supervision of a grand jury is so minor 
that the Supreme Court has held that the judge's absence 
from the federal judicial district in which the grand jury is 
sitting neither implicates constitutional rights of the defen-
dant nor otherwise constitutes cognizable error. See Badders 
v. United States, 240 U.S. 391, 394 (1916). Therefore, "[g]iv-
en the grand jury's operational separateness from its consti-
tuting court, it should come as no surprise that [the Supreme 
Court] ha[s] been reluctant to invoke the judicial supervisory 
power as a basis for prescribing modes of grand jury proce-
dure." Williams, 504 U.S. at 49-50.

 Accordingly, to the extent that the supervision of a federal-
ly competent grand jury implicates the Article III "judicial 
power of the United States," the power is a circumscribed one 
and is far removed from "the essential attributes of the 
judicial power" with which Article III is principally con-
cerned. Crowell v. Benson, 285 U.S. 22, 51 (1932). More-
over, section 1916(a) is applicable only to the "unique federal 
enclave," Northern Pipeline Constr. Co. v. Marathon Pipe 
Line Co., 458 U.S. 50, 75 (1982) (plurality op.) [hereinafter 
Northern Pipeline], that is the District of Columbia.

 (2) Expanded Executive Branch Involvement with Grand 

 Jury as Encroachment on Judicial Branch

 Seals and Sweatt contend that section 1916(a), by substitut-
ing Article I for Article III supervision of a federally-
competent grand jury, unconstitutionally encroaches on the 
judicial branch. Their argument rests on the notion that a 
D.C. Superior Court judge, lacking life tenure and salary 
protections, is less able to curb federal prosecutorial abuses 
than his United States District Court counterpart. We think 
this notion is questionable at best. See Palmore v. United 


States, 411 U.S. 389, 402 (1993) ("Nor, more particularly, has 
the enforcement of federal criminal law been deemed the 
exclusive province of federal Art. III courts. Very early in 
our history, Congress left the enforcement of selected federal 
criminal laws to state courts and to state court judges who 
did not enjoy the protections prescribed for federal judges in 
Art. III."); cf. Testa v. Katt, 330 U.S. 386 (1947) (Supremacy 
Clause required Rhode Island trial court to enforce non-penal 
provisions of federal penal price control statute). The delega-
tion of certain Article III powers to United States magistrate 
judges, who are not Article III judges, has also been upheld. 
See, e.g., Peretz v. United States, 501 U.S. 923, 937 (1991) 
(structural constitutional protection not abrogated by allowing 
magistrate to conduct voir dire); United States v. Raddatz, 
447 U.S. 667, 683 (1980) (delegation of suppression hearing to 
magistrate did not violate Article III or Due Process Clause 
so long as Article III court retained final authority). More-
over, the Supreme Court has held that a D.C. Superior Court 
judge is presumed competent to pass on federal constitutional 
questions that may arise in the course of a criminal trial. See 
Swain v. Pressley, 430 U.S. 372, 383 (1977) ("[T]he judges of 
the Superior Court of the District of Columbia must be 
presumed competent to decide all issues, including constitu-
tional issues, that routinely arise in the trial of criminal 
cases.").7

__________
 7 We do not here conclude that there are no constitutional limita-
tions on the Congress's authority to delegate either grand jury 
supervisory functions or federal felony trial supervisory powers to 
state and Article I judges, as controlling precedent suggests that, in 
at least some instances, a non-consenting defendant may have a 
personal constitutional claim to adjudication by an Article III 
judge. See Gomez v. United States, 490 U.S. 858, 872 n.25 (1989); 
Peretz, 501 U.S. at 936 ("[I]t is arguable that a defendant in a 
criminal trial has the right to demand the presence of an Article III 
judge at voir dire."). Even if a defendant has such a constitutional 
right to Article III adjudication, it is far from clear that he has a 
corresponding right to indictment under Article III supervision. 
Further, because the grand jury conducts its proceedings ex parte, 
it would be difficult (if not impossible) to obtain the accused's 
consent to non-Article III supervision without altering the funda-


 The appellants' challenge requires us to assess the "prac-
tical effect" of the alleged infringement of Article III power:

 [I]n reviewing Article III challenges, we have weighed a 
 number of factors, none of which has been deemed 
 determinative, with an eye to the practical effect that the 
 congressional action will have on the constitutionally 
 assigned role of the federal judiciary. ... Among the 
 factors upon which we have focused are [1] the extent to 
 which the 'essential attributes of judicial power' are 
 reserved to Article III courts, and, conversely, [2] the 
 extent to which the non-Article III forum exercises the 
 range of jurisdiction and powers normally vested only in 
 Article III courts, [3] the origins and importance of the 
 right to be adjudicated, and [4] the concerns that drove 
 Congress to depart from the requirements of Article III.

Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 
851 (1986) (emphasis added). Applying the Schor test here, 
we conclude that section 1916(a) does not abrogate Article III 
structural protections.8

 First, as discussed earlier, the power to supervise a federal-
ly-competent grand jury cannot fairly be described as an 
"essential attribute" of the "judicial power of the United 
States." The limited authority a supervising judge wields, 
the independence of the grand jury from both the judicial and 

__________
mental and independent role of the grand jury in the investigative 
and indictment process--something Williams plainly proscribes. 
See Williams, 504 U.S. at 52-55 (rejecting judicial rule requiring 
presentation of exculpatory evidence to grand jury because it would 
"alter the grand jury's historical role").

 8 While Schor addressed the constitutionality of the Commodity 
Futures Trade Commission's power to decide a state-law counter-
claim in an administrative reparation proceeding, there is no reason 
that the structural constitutional analysis should be any different in 
the criminal context. See, e.g., Mistretta v. United States, 488 U.S. 
361, 382-83 (1989) (citing Schor in describing separation of powers 
analysis to be applied in determining constitutionality of grant of 
authority to Sentencing Commission to set mandatory minimum 
punishments for criminal violations of U.S. Code).


executive branches, as well as the fact that such supervisory 
responsibilities are often discharged by a magistrate judge 
(without requiring the accused's consent)--all manifest that 
the supervisory power at issue is not an "essential attribute" 
of the "judicial power of the United States." See generally 
Williams, 504 U.S. at 47-55.

 Second, even if supervision of a federally-competent grand 
jury qualified as an "essential attribute," section 1916(a) 
authorizes only a limited sharing of the supervisory power 
with an Article I court. An Article III judge continues to 
preside at the defendant's trial and retains his authority to 
dismiss an indictment. Cf. Bank of Nova Scotia v. United 
States, 487 U.S. 250, 254 (1988) ("We hold that, as a general 
matter, a district court may not dismiss an indictment for 
errors in grand jury proceedings unless such errors preju-
diced the defendants."); United States v. Raddatz, 447 U.S. 
667, 683 (1980) (delegation of authority to conduct suppres-
sion hearing to magistrate judge "does not violate Article III 
so long as the ultimate [suppression] decision is made by the 
district court").

 Third, while indictment or presentment by a grand jury is a 
right secured to felony defendants by the Fifth Amendment, 
the history and origins of the grand jury suggest that any 
constitutional right to have it supervised by an Article III 
judge is of much more recent vintage:

 The grand jury is an English institution, brought to this 
 country by the early colonists and incorporated into the 
 Constitution by the Founders. There is every reason to 
 believe that our constitutional grand jury was intended to 
 operate substantially like its English progenitor. The 
 basic purpose of the English grand jury was to provide a 
 fair method for instituting criminal proceedings against 
 persons believed to have committed crimes. Grand ju-
 rors were selected from the body of the people and their 
 work was not hampered by rigid procedural or evidential 
 rules. In fact, grand jurors could act on their own 
 knowledge and were free to make their presentments or 
 indictments on such information as they deemed satisfac-


 tory. Despite its broad power to institute criminal pro-
 ceedings the grand jury grew in popular favor with the 
 years. It acquired an independence in England free 
 from control by the Crown or judges.

Costello v. United States, 350 U.S. 359, 362 (1956) (emphasis 
added); accord Hurtado v. California, 110 U.S. 516, 530 
(1884) ("When we add to this that the primitive grand jury 
heard no witnesses in support of the truth of the charges to 
be preferred, but presented upon common fame and general 
suspicion, we shall be ready to acknowledge that it is better 
not to go too far back into antiquity for the best securities for 
our 'ancient liberties.' "). Thus, the grand jury's reliance on a 
judge for subpoenas, immunity orders and the like is a 
relatively recent development in the history of the institution, 
resulting, no doubt, from proscribing the jurors' reliance on 
personal knowledge of events in the vicinage to form their 
opinions. Cf. Edward J. Finley II, Note, Ignorance as Bliss? 
The Historical Development of an American Rule on Juror 
Knowledge, 1990 U. Chi. Legal F. 457, 468 (jurors' use of 
personal knowledge not prohibited by many states until end 
of nineteenth century); see also Badders, 240 U.S. at 394-95 
(1916) (finding no error, constitutional or otherwise, in district 
judge's absence from District during grand jury deliberation).

 Fourth, section 1916(a) promotes efficiency resulting from 
the identity (both in composition and function) of the D.C. 
Superior Court grand jury and the federal grand jury:

 [G]rand jurors for both the District Court and the Supe-
 rior Court are selected from the same pool of names, by 
 the same jury commissioners, by use of the Superior 
 Court computer, and pursuant to an identical method. 
 Moreover the grand jurors in the two courts have identi-
 cal qualifications and it is only by chance that a person 
 may be selected to serve on one grand jury rather than 
 the other. The grand jury procedure is virtually identi-
 cal in both.

United States v. Hackney, 389 A.2d 1336, 1340 (D.C. 1978), 
cert. denied, 439 U.S. 1132 (1979). In addition, the provision 
immediately following section 1916 directs:


 To the extent feasible, the Superior Court and the Unit-
 ed States District Court shall consider the respective 
 needs of each court in the qualification, selection, and 
 service of jurors. Nothing in this chapter shall be con-
 strued to prevent such courts from entering into any 
 agreement for sharing of resources and facilities (includ-
 ing automated data processing and hardware and soft-
 ware, forms, postage, and other resources).

D.C. Code Ann. s 11-1917 (1981 & Supp. 1995). Given the 
limited pool of potential jurors available to serve both the 
D.C. Superior Court and the United States District Court, it 
is hardly surprising that the Congress should vest a grand 
jury empaneled by either court with authority to return an 
indictment in the other or that judicial supervisory authority 
should be shared by the courts. See Atkinson v. United 
States, 295 A.2d 899, 901-02 (D.C. 1972) (observing that as of 
February 1971, grand jury sitting in one court could return 
indictment to other court). While the grand jury arrange-
ment in the District of Columbia may be unique, "[o]ur 
constitutional principles of separated powers are not violated 
... by mere anomaly or innovation." Mistretta v. United 
States, 488 U.S. 361, 385 (1988).

 The two cases Seals and Sweatt rely on do not suggest a 
different conclusion. They first cite O'Donoghue v. United 
States, 289 U.S. 516 (1932), in which the Supreme Court 
upheld the classification of District of Columbia courts as 
Article III courts because (1) the Congress did not expressly 
denominate them Article I tribunals, (2) the Congress consis-
tently treated them like other Article III courts, (3) it vested 
them with broad powers to determine matters under national 
laws and (4) they were the only courts to which District of 
Columbia residents could turn to protect their federal statuto-
ry rights. See 289 U.S. at 534-35, 544-49; cf. Palmore, 411 
U.S. at 405-07 (O'Donoghue "[r]el[ied] heavily on congres-
sional intent" to uphold D.C. courts as Article III courts). 
Some forty-one years later, after the Congress established 
separate Article I and Article III courts in the District of 
Columbia, the Supreme Court held that Article III did not 
prohibit the Congress from authorizing D.C. Superior Court 


judges to hear federal criminal cases brought under corre-
sponding provisions of the D.C. Code. Palmore, 411 U.S. at 
389. Accordingly, O'Donoghue offers the appellants no sup-
port for their challenge.

 Second, the plurality opinion in Northern Pipeline does not 
support the appellants.9 In that opinion, Justice Brennan 
likened the Congress's plenary Article I authority over the 
District of Columbia to its authority over territorial matters 
pursuant to Article IV and, with three other justices, held 
that, with respect to such enclaves, "the general principle of 
independent adjudication commanded by Art. III does not 
apply." 458 U.S. at 76 (emphasis added).

 (3) Other Considerations

 The line of cases confirming the Congress's plenary author-
ity over the District of Columbia pursuant to Article I, s 8, cl. 
17, further fortifies our holding today.10 In particular, Pal-
more recognizes that "[i]t is apparent that the power of 
Congress under Clause 17 permits it to legislate for the 
District in a manner with respect to subjects that would 
exceed its powers, or at least would be very unusual, in the 
context of national legislation enacted under other powers 

__________
 9 The precedential value of Northern Pipeline, which did not 
produce a majority opinion, has been subsequently weakened. See 
Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 584 
(1985) ("The Court's holding in [Northern Pipeline] establishes only 
that Congress may not vest in a non-Article III court the power to 
adjudicate, render final judgment, and issue binding orders in a 
traditional contract action arising under state law, without the 
consent of the litigants, and subject only to ordinary appellate 
review.") (emphasis added); cf. Fields v. Washington Metro. Area 
Transit Auth., 743 F.2d 890, 894 n.10 (D.C. Cir. 1984).

 10 Article I, s 8, cl. 17, in relevant part provides:

 [The Congress shall have Power] To exercise exclusive Leg-
 islation in all Cases whatsoever, over such District (not exceed-
 ing ten Miles square) as may, by Cession of particular States, 
 and the Acceptance of the Congress, become the Seat of the 
 Government of the United States....


delegated to it under Art I...." 411 U.S. at 397-98. Subse-
quently, the plurality opinion in Northern Pipeline went even 
further in describing the extent of the Congress's plenary 
authority under Article I, s 8, cl. 17: "Congress' power over 
the District of Columbia encompasses the full authority of the 
government, and thus, necessarily, the Executive and Judi-
cial powers as well as the Legislative." 458 U.S. at 76.

 Moreover, we cannot find in the Fifth Amendment any 
basis for concern regarding the assignment of the grand jury 
supervisory function to a non-Article III judge. Instead, we 
conclude that if a D.C. Superior Court judge is competent, 
despite lacking life tenure and salary protections, to adjudi-
cate a constitutional right as fundamental as that guaranteed 
by the writ of habeas corpus--see Swain, 430 U.S. at 383--we 
see no reason that the same judge cannot likewise protect 
whatever Fifth Amendment right the appellants might have 
to indictment by a federally-competent grand jury supervised 
by an impartial and independent judge.

 C. Sweatt's Kidnapping Conviction

 The federal kidnapping statute, in relevant part, provides:

 Whoever unlawfully seizes, confines, inveigles, decoys, 
 kidnaps, abducts, or carries away and holds for ransom 
 or reward or otherwise any person, except in the case of 
 a minor by the parent thereof, when--

 (1) the person is willfully transported in interstate or 
 foreign commerce;

 (2) any such act against the person is done within the 
 special maritime and territorial jurisdiction of the 
 United States;

 (3) any such act against the person is done within the 
 special aircraft jurisdiction of the United States as 
 defined in section 46501 of title 49;

 (4) the person is a foreign official, an internationally 
 protected person, or an official guest as those terms 
 are defined in section 1116(b) of this title; or


 (5) the person is among those officers and employees 
 designated in section 1114 of this title and any such act 
 against the person is done while the person is engaged 
 in, or on account of, the performance of official duties;

 shall be punished by imprisonment for any term of years 
 or for life and, if the death of any person results, shall be 
 punished by death or life imprisonment.

18 U.S.C. s 1201(a) (emphasis added). Sweatt contends that 
the word "when" as used in section 1201(a) means that the 
kidnapping ended after the victim was transported across 
state lines and before he became involved in holding the 
victim and retrieving the ransom.11 He therefore reasons 
that he cannot be held criminally liable as a principal, aider 
and abettor or Pinkerton co-conspirator under 18 U.S.C. 
s 1201(a). He is mistaken.

 Sweatt's crabbed reading of section 1201(a) is contrary to 
the "natural meaning" of the term "when." See United 
States v. Wells, 117 S. Ct. 921, 927 (1997) ("the first criterion 
in the interpretive hierarchy, a natural reading of the full 
text") (citing United States v. American Trucking Ass'n, Inc., 
310 U.S. 534, 542-43 (1940)). The term "when" is used in 
section 1201(a) not in its temporal sense--i.e., "at the time 
that"--but rather in its categorical sense--i.e., "in cases 
where." This is evident from the syntax and structure of the 
provision: the list of factors immediately following "when" 
describes activities the provision intends to forbid, not their 
chronology. Moreover, if "when" had the meaning Sweatt 
ascribes to it, the word "while" in subsection (5) of section 
1201(a) would be superfluous--again, a disfavored construc-
tion. See Montclair v. Ramsdell, 107 U.S. 147, 152 (1883) 
(courts should "give effect, if possible, to every clause and 
word of a statute"); cf. Moskal v. United States, 498 U.S. 103, 

__________
 11 According to the Government's evidence, Sweatt assisted in 
holding the victim in Maryland while the ransom demand was made 
and he and Seals traveled to the District of Columbia to pick up the 
ransom. See Trial Tr. 612-14, 619-20, 709-10, 1156, 1171. There 
was also evidence that a telephone call was placed to Sweatt shortly 
after the victim was abducted. Id. at 713-16.


111 (1990) (declining to read provision narrowly so as to "limit 
it to instances of fraud rather than the class of fraud 
encompassed by its language") (emphasis added); Bell v. 
United States, 462 U.S. 356, 362 (1983) ("[F]ederal criminal 
statutes that are intended to fill a void in local law enforce-
ment should be construed broadly.").

 Other courts have held that, even though a violation of 18 
U.S.C. s 1201(a) occurs when all of the essential elements of 
the offense have been satisfied, the crime of kidnapping 
continues while the victim remains held and a ransom sought. 
See United States v. Denny-Shaffer, 2 F.3d 999, 1018 (10th 
Cir. 1993) ("The broad language of s 1201(a) defines a con-
tinuing offense."); cf. United States v. Garcia, 854 F.2d 340, 
344 (9th Cir. 1988) (federal kidnapping is continuing offense 
and therefore statute of limitations does not begin with 
transport of victim across state lines), cert. denied, 490 U.S. 
1094 (1989); cf. also Grunewald v. United States, 353 U.S. 
391, 403 (1957) ("Kidnapers in hiding, waiting for ransom, 
commit acts of concealment in furtherance of the objectives of 
the conspiracy itself, just as repainting a stolen car would be 
in furtherance of a conspiracy to steal; in both cases the 
successful accomplishment of the crime necessitates conceal-
ment.") (note omitted); see also McElroy v. United States, 
455 U.S. 642, 654-56 (1982) (rejecting, as contrary to statute's 
purpose of aiding in apprehension of criminals who misuse 
channels of interstate commerce, argument that federal for-
gery conviction must be overturned because prosecutor had 
failed to establish instrument was forged before transport 
across state lines); United States v. Toledo, 985 F.2d 1462, 
1467 (10th Cir.) (in enacting section 1201(a) "Congress was 
attempting to address the misuse of interstate commerce by 
kidnappers to frustrate the efforts of state police"), cert. 
denied, 510 U.S. 878 (1993). Accordingly, there was sufficient 
evidence to convict Sweatt as at least an aider and abettor--
which is all that is required to sustain his conviction. See 
Griffin v. United States, 502 U.S. 46, 49 (1991) ("[A] general 
jury verdict [is] valid so long as it [is] legally supportable on 
one of the submitted grounds....").


 Nor do the cases Sweatt cites compel a different conclusion. 
The cases hold only that unlawful abduction and transport 
across state lines is sufficient to violate section 1201(a); they 
do not hold, nor does it follow from their holdings, that the 
kidnapping concludes once the abduction and transport occur. 
See, e.g., United States v. Broadwell, 870 F.2d 594, 601 & n.16 
(11th Cir.) (holding that unlawful restraint began when victim 
was abducted and "continued" after he was transported 
across state lines even though crime "complete" upon trans-
port), cert. denied, 493 U.S. 840 (1989). Accordingly, we 
uphold Sweatt's conviction on the kidnapping charge.12

 D. Sweatt as "Career Offender" Under Section 4B1.1

 We held in United States v. Price, 990 F.2d 1367 (D.C. Cir. 
1993), that "the Sentencing Commission adopted ss 4B1.1 & 
4B1.2 solely in an effort to fulfill the mandate of 28 U.S.C. 
s 994(h)" and therefore only those offenses specified in sec-
tion 994(h) can render the defendant a "career offender." 990 
F.2d at 1368. Because aiding and abetting, conspiring and 
attempting to commit certain narcotics offenses are not 
among those offenses listed in section 994(h), we held that the 
defendant could not be sentenced as a career offender on the 
basis of prior convictions of those offenses. Id. Price con-
cluded that Application Note 1 to section 4B1.2 of the Guide-

__________
 12 We express no opinion regarding the Government's and 
Sweatt's opposing arguments as to his culpability on a Pinkerton 
theory. We also note that although the trial court's charge, in 
describing the elements of kidnapping required to convict Seals and 
Sweatt as principals, declared that Sweatt could not be convicted 
unless he was shown to have participated in the abduction or 
transport of the victim across state lines (Trial Tr. 1926), the aiding 
and abetting charge (id. at 1917-19) contained no such limitation 
and could have been used by a reasonable jury to convict Sweatt of 
kidnapping. See Griffin, 502 U.S. at 49. In any event, although we 
need not reach the issue today, we doubt that a criminal defendant 
can obtain reversal of his conviction solely on the basis of instruc-
tions that create erroneous and unnecessary impediments to convic-
tion. See United States v. Bomski, 125 F.3d 1115, 1116 (7th Cir. 
1997).


lines was invalid to the extent it suggested that convictions of 
certain inchoate offenses counted in treating the defendant as 
a career offender. Id. We held open the question, however, 
whether the Sentencing Commission could repromulgate Ap-
plication Note 1 pursuant to statutory authority other than 
section 994(h), including its discretionary authority under 
section 994(a). See id. at 1370 ("Thus, without passing on the 
Commission's authority to re-adopt Application Note 1 to 
s 4B1.2 (or some variation of Note 1) on alternative grounds, 
we vacate the sentence and remand the case to the district 
court for resentencing.").

 The Commission responded by amending and repromulgat-
ing the Background Commentary to section 4B1.1 of the 
Guidelines. The repromulgated version clarified that, pursu-
ant to the Commission's general statutory authority, 28 
U.S.C. s 994(a)-(f), and its amendment authority, 28 U.S.C. 
s 994(o)-(p), prior convictions that can count toward career 
offender status include convictions of attempts, aiding and 
abetting and other inchoate offenses. See 1995 Guidelines 
Manual, App. C, Am. 528 at 434-35. The repromulgated 
Background Commentary to section 4B1.1 became effective 
on November 1, 1995.

 Sweatt argues that in light of Price, the district court 
improperly sentenced him as a career offender under the 
repromulgated version of section 4B1.1 because his 1987 
conviction of attempted distribution of heroin could not be 
used under the November 1994 version of section 4B1.1--the 
version in effect when he committed the crimes.13 By retro-
actively applying the November 1995 version of section 4B1.1, 
he reasons, the trial court imposed a greater punishment than 
it could have imposed under the law as it existed when the 
crimes were committed, violating the Ex Post Facto Clause. 
See, e.g., United States v. Stover, 93 F.3d 1379, 1386 (8th Cir. 
1996); United States v. Smallwood, 35 F.3d 414, 417-18 n.18 
(9th Cir. 1994); United States v. Saucedo, 950 F.2d 1508, 1515 
(10th Cir. 1991).

__________
 13 Sweatt does not dispute that his 1987 robbery conviction was 
properly counted as a prior conviction under section 4B1.1.


 The Government essentially concedes that Sweatt's reading 
of Price is correct but it contends that we should overrule 
Price. See Appellee Br. at 43. Nevertheless, the law is well 
settled that one panel may not "overrule the decision of 
another panel of this court." United States v. Doe, 730 F.2d 
1529, 1531 n.2 (D.C. Cir. 1984). Accordingly, we vacate 
Sweatt's sentence as a career offender pursuant to section 
4B1.1 of the Guidelines and remand to the district court for 
resentencing.

 III. CONCLUSION

 For the foregoing reasons, we affirm the appellants' convic-
tions. We vacate appellant Sweatt's sentence as a career 
offender and remand for resentencing in accordance with the 
terms of this opinion.

 So ordered.